A94A0211. GRUBER et al. v. WILNER et al.
(443 SE2d 673)

BEASLEY, Presiding Judge.

In June 1991, Gruber, a residential real estate broker, and Taylor & Williams, Architects, Inc. (T&W) sued David and Suzanne Wilner and Brumbelow Road Development Corporation (BRDC), a subchapter S corporation formed by the Wilners to develop property in a joint venture with the plaintiffs. The suit is based on an alleged 1983 joint venture agreement, 1986 consulting and profit-sharing agreements, and as to Gruber, quantum meruit.

In Count 1, Gruber seeks 15 percent of the net profits from the sale of the property and T&W seeks 25 percent of the net profits under the parties' joint venture agreement. In Count 2, Gruber seeks a recovery in quantum meruit in excess of $50,000 for rendering over 1,000 hours of valuable services at the rate of $50 per hour.

The trial court granted a motion for summary judgment filed by the Wilners, in which they argued that plaintiffs' claims are against BRDC and not the Wilners in their individual capacities. There has been no ruling on a motion for summary judgment filed by BRDC.

The events leading up to the suit are as follows. In 1982, the Wilners discussed with Gruber the purchase of a 36-acre parcel of land on Brumbelow Road which was to be used by the Wilners as a home site. As agreed to by the parties, a trust of which Suzanne Wilner was beneficiary purchased the property for $228,000, and Gruber arranged for the performance of a percolation test which showed that the property would support development. In 1983, Gruber introduced the Wilners to Richard Taylor of T&W, and they began preliminary discussions on a joint venture to develop the land. In November there was a meeting attended by Gruber, the Wilners, and counsel representing the Wilners and the trust.

Counsel's memorandum of this meeting stated: Through extensive consultations with the Wilners, Gruber and T&W developed a tentative plan for development of the property. Approximately

$320,000 in expenditures would be required to subdivide the property into lots and construct appropriate amenities. It was tentatively concluded that the property would be developed and lots sold through a subchapter S corporation to be formed by the Wilners. Development costs would be defrayed through either debt or equity financing provided to the corporation by the Wilners. The corporation would buy the land at its fair market value from the trust when the project was approved by all the parties. Contracts would be drawn between the corporation and Gruber and T&W defining the parties' rights and duties. It was generally agreed that the rezoning would proceed immediately. Although no time schedule for these activities was proposed, counsel suggested that some determination be reached as to when financing would be required.

In January 1984, Gruber, representing the trust, applied for and obtained a rezoning of the land from agricultural (AG-1) to single-family residential.

Another meeting was held in March at which the Wilners, counsel, Taylor, and Gruber were present. In his memorandum of that meeting, counsel stated: Although it was assumed that the Wilners would make loans to the corporation to advance the project, no clear consensus was reached as to how much financing would be required or whether it would include the building of speculative houses. In the opinion of counsel, these questions needed to be resolved because they affected the amount of capital at risk and the appropriate division of the profit. It was agreed that individual contracts would be prepared for Gruber and Taylor to define the terms of their respective employments by the corporation. It was contemplated that Gruber would be the exclusive sales agent for the corporation and would receive the standard commission as sales agent for the lots or houses, whichever were sold. In addition, he would receive an hourly rate of compensation for performance of his duties in consulting, expediting, securing necessary permits, marketing, and promoting. As each lot or house was sold, he would receive 15 percent of the net profit realized on such sale. If he were fired without cause or the project terminated for any reason, he would have a limited option to purchase 15 percent of the unsold lots at their cost.

With respect to T&W, counsel stated in the memorandum that it was to provide consulting services, relating to the design of the subdivision and supervision of engineering, development, and construction. For these services, T&W was to be paid its standard hourly rate less 10 percent, as well as 25 percent of the net profit as each unit was sold. It was agreed that if T&W were fired without cause or the project abandoned, T&W would have the option to buy 25 percent of the unsold lots. Finally, counsel noted that financing remained an unresolved problem.

BRDC was formed in June, with the Wilners as the sole shareholders, officers, and directors. The trust sold the land to BRDC for $545,000, its appraised value in December. In October 1985, a disturbance permit was issued to BRDC, based on a filed plan showing that the land had been divided into 42 lots. Agreements between BRDC and Gruber and T&W went through several drafts in 1984 and 1985, but were not signed. In January 1986, Gruber applied for rezoning of the land to a higher density, which was granted in March. During these years, the Wilners were employed full-time in occupations unrelated to real estate, and the development of the property was moved along through the efforts of Gruber and T&W.

BRDC and T&W entered into a consulting and profit-sharing agreement dated February 12, 1986, signed by David Wilner as president of BRDC and James Williams as president of T&W. A consulting and profit-sharing agreement between Gruber and BRDC is dated April 5, 1986, but was signed only by Gruber.

Each agreement stated that BRDC planned to develop and improve the Brumbelow property as a residential subdivision by subdividing the property into lots, but that it "is not obligated to develop and improve the property, and may otherwise dispose of the property if, in BRDC's sole discretion, development and improvement of the property is not feasible or desirable." The termination date of each agreement was December 31, 1990.

In the T&W agreement, BRDC agreed to pay it a consulting fee at T&W's standard hourly rates less 10 percent, as well as 25 percent of the net profit, if any, realized by BRDC upon the sale of any lot consummated prior to the termination of the agreement.

In the Gruber agreement, BRDC agreed to pay him a monthly consulting fee of $50 per hour for services actually rendered upon timely submission of written documentation, as well as 15 percent of the net profit, it any, realized upon the sale of any lot consummated prior to termination of the agreement.

Each agreement stated that BRDC, Gruber, and T&W would meet and determine the selling price of each subdivided lot, develop a marketing plan, and proceed to offer the lots for sale. Each agreement contained an "entire agreement" clause stating that the agreement "supersedes all prior negotiations, agreements and oral understandings between the parties and constitutes the entire agreement between the parties." Neither agreement gave Gruber or T&W a purchase option in the event they were fired without cause or the project terminated.

David Wilner testified that it became necessary to sell the property without developing it because financing was unobtainable. In October 1987, approximately 22.6 acres of the land was sold for $685,770. In December the Wilners informed Gruber and T&W that

since the land was not going to be developed and marketed as a subdivision, their services were no longer needed. In July 1988, the remainder of the parcel was sold for $376,180. The total proceeds, including option money, was $1,071,950. Gruber was not the sales broker. In 1988, BRDC paid salaries of $51,200 to David Wilner and $76,800 to Suzanne Wilner. They refused to pay any share of the profits to Gruber or T&W.

1. Plaintiffs argue that the Wilners owed them a fiduciary duty under the parties' oral joint venture agreement, as established in counsel's memoranda, and that this included a duty on the part of the Wilners to distribute 40 percent of the profits from the sale of the property to plaintiffs rather than paying exorbitant salaries to themselves.[1]

Plaintiffs have cited cases such as *Granik v. Perry*, 418 F2d 832, 836 (3) (5th Cir. 1969) and *Donahue v. Davis*, 68 S2d 163, 171 (7) (Fla. 1953), which are authority in support of the argument that parties to a joint venture agreement continue to owe a fiduciary duty to each other even though they may determine to carry out the purpose of the agreement through the medium of a corporation. "It is generally held that a joint venture agreement continues in effect following the formation of a corporation created to implement it *if the intention of the parties to this effect is clear*." (Emphasis supplied; footnote omitted.) 48A CJS, Joint Ventures, § 20, p. 435 (1981). On the other hand, when the intention of the parties to a joint venture is to merge their joint venture agreement, or certain rights and obligations under it, into the form of a corporation, they are bound by the result. *Sagamore Corp. v. Diamond West Energy Corp.*, 806 F2d 373, 378 (1) (2d Cir. 1986).

The consulting and profit-sharing agreements clearly evince an intention of the parties to have plaintiffs' right to their share of the profits upon the sale of the property governed by those agreements. Consequently, plaintiffs' claim for nonpayment of their share of the profits upon the sale of the property is against BRDC under the agreements and not against the Wilners individually.

2. BRDC and Gruber are bound by the consulting and profit-sharing agreement, notwithstanding BRDC's failure to sign the agreement, so that Gruber cannot go behind it and base the Wilners' liability on the alleged joint venture agreement.

"The object of securing signatures of the parties to a written contract is, of course, to take it out of the Statute of Frauds and to afford mutuality so that it may be enforced. [Cits.] But this is not the only

---

[1] Although plaintiffs state that the Wilners were obligated to provide development financing under the parties' joint venture agreement, they do not argue that they are entitled to damages by reason of the Wilners' breach of this duty.

manner of obtaining mutuality. If one of the parties has not signed, his acceptance is inferred from a performance under the contract, in part or in full, and he becomes bound. [Cits.]" *Cooper v. G. E. Constr. Co.*, 116 Ga. App. 690, 694 (2) (158 SE2d 305) (1967); see *Valiant Steel &c. v. Roadway Express*, 205 Ga. App. 237, 240 (3) (421 SE2d 773) (1992). " 'A contract signed by one of the parties only, but accepted and acted on by the other party to it, may be just as binding as if it were signed by both parties, if the obligations of the parties are mutual.' [Cits.]" *Nationwide Mut. Ins. Co. v. Teal*, 112 Ga. App. 236 (2) (144 SE2d 567) (1965). There is evidence from plaintiffs of part performance of the consulting and profit-sharing agreements by all parties.

3. Gruber's claim for quantum meruit for services rendered by him in developing the property is likewise against BRDC and not the Wilners individually. Moreover, there can be no recovery on quantum meruit when there is an express contract between the parties. *American Demolition v. Hapeville Hotel Ltd. Partnership*, 202 Ga. App. 107, 110 (2) (413 SE2d 749) (1991).

*Judgment affirmed. Andrews and Johnson, JJ., concur.*

DECIDED APRIL 18, 1994.

*Sakas & Horne, Jeffrey L. Sakas, Michael P. Froman*, for appellants.
*Ted L. Marcus*, for appellees.