CHEMTALL INCORPORATED, Plaintiff,

v.

CITI–CHEM, INC. and Calvin M. King, Defendants.

PEARL RIVER POLYMERS, INC., Plaintiff,

v.

CITI–CHEM, INC. and Calvin M. King, Defendants.

Nos. CV 496–218, CV 496–192.

United States District Court, S.D. Georgia, Savannah Division.

Jan. 27, 1998.

Brent Jamieson Savage, Savage, Herndon & Turner, Savannah, GA, for Pearl River Polymers, Incorporated, plaintiff.

Donald Campbell Bowman, Jr., Karsman, Brooks & Callaway, Savannah, GA, for Citi–Chem, Inc., Calvin King, defendants.

### ORDER

EDENFIELD, District Judge.

Before the Court is a slew of motions filed by plaintiffs Pearl River Polymers, Inc. ("Pearl River"), and Chemtall, Incorporated ("Chemtall"), against defendants Citi–Chem, Inc. ("Citi–Chem") and Calvin M. King. King has filed some of his own. The caption above has been amended to reflect the Court's consolidation of *Chemtall, Incorporated v. Citi–Chem, Inc. and Calvin M.*

King, CV496-218 with *Pearl River Polymers, Inc. v. Citi–Chem, Inc., Calvin M. King,* CV496-192. The two cases present common questions of law and fact within the meaning of F.R.Civ.P. 42(a). *Pearl River,* originally assigned to Judge W.T. Moore, is reassigned to the undersigned. *See* CV496–192, doc. # 69. Henceforth, all filings shall bear the consolidation caption used above and shall be filed, for administrative convenience only, under the *Pearl River* proceeding, CV496–192.

## I. BACKGROUND

### A. The Product Sales Agreement

In the 1980s, Citi–Chem—then and now 100% owned and controlled by King—entered into a sales relationship with Chemtall. CV496-218, doc. # 40, exh. A (Stipulations (a) & (d)). Chemtall, a Riceboro, Georgia company, manufactured water-treatment polymer products for sale by Citi–Chem under its "Citi–Chem" trade name. Carlson Aff. ¶ 6, CV496–192 doc. # 56, exh. 1.[1] Chemtall shipped its products from Georgia directly to Citi–Chem customers, then billed Citi–Chem, located in New Jersey. Carlson Aff. ¶¶ 6, 27. Citi–Chem, in turn, simultaneously invoiced its customers, and on each invoice instructed them to remit their payments to a Georgia bank lockbox. Carlson Aff. ¶¶ 6–7. From there the money would be divided pursuant to the parties' agreement.[2] Carlson Aff. ¶¶ 6–7, 9.

After Chemtall's Georgia-based parent company acquired Pearl River, which also manufactures water-treatment polymers but is located in Louisiana, Pearl River joined Chemtall in the same arrangement with Citi–Chem. Carlson Aff. ¶¶ 10–12, 25–26. Chemtall's corporate parent managed Pearl River from Riceboro, Georgia. Carlson Aff. ¶ 10. Citi–Chem's "Pearl–River" customers were

1. Another Carlson affidavit is found in CV496–218 as doc. # 37, exh. 1. Except where otherwise noted, all "Carlson Aff." references herein are to the version that is filed in CV496–192 as doc. # 56, exh. 1.

2. Some further elaboration of this process is warranted in light of the issues raised in this case. Upon making a sale, Citi–Chem would send a copy of its customer invoice to Chemtall's Georgia office, precipitating Chemtall's product

shipment to that customer. Carlson Aff. ¶ 19. Chemtall would then bill Citi–Chem based upon an existing price schedule. *Id.* After Citi–Chem's customers remitted to the lockbox, the managing agent (at first King, later Chemtall, *see* Carlson Aff. ¶ 13) would reconcile the Citi–Chem customer invoices with the Chemtall invoices in order to make the appropriate revenue split between the parties. Carlson Aff. ¶¶ 14, 19; *see also* 7/14/97 Stackhouse Dep. at 56.

also to remit to the Georgia lockbox. *Id.* ¶ 19.

### B. Lockbox Problems—"The Early Days"

The lockbox arrangement originated from Chemtall's conclusion that neither Citi–Chem nor King, who is Citi–Chem's CEO, were creditworthy. Carlson Aff. ¶ 7; CV496–218, doc. # 40, exh. A (Stipulations); *see also* 1/28/97 King Dep. at 47–48 (King insisting that he did not know why the parties entered into the lockbox arrangement); *but see id.* at 86 (admitting that the lockbox was set up "[t]o control the receivables of Citi–Chem"). Nevertheless, Chemtall initially agreed to let King act as the lockbox's "managing agent." Carlson Aff. ¶ 13. Hence, it left it to King to divide the revenues according to the marketing agreement and send Chemtall its share, while issuing a check to Citi–Chem for its share. Carlson Aff. ¶ 14.

By 1991, however, King began to take too long in forwarding to Chemtall (and now Pearl River) their share, so the parties mutually agreed that Chemtall would replace King as the managing agent vested with sole check-writing authority. Carlson Aff. ¶ 13. Chemtall/Pearl River performed all lockbox accounting activity in Georgia, and from there sent checks to Citi–Chem in New Jersey. *Id.* As before, all payments should

have been sent directly from Citi–Chem customers to the Georgia lockbox, not to Citi–Chem directly. Carlson Aff. ¶ 17.

In his 1/28/97 deposition, King denied that Citi–Chem had agreed to do that, *see* 1/28/97 King Dep. at 115–16, though he had previously acknowledged that plaintiffs "forced" him to comply with such "arrangement." *Id.* at 86. In the next breath, however, he conceded that in fact he did "agree" to it, *id.* at 87, but only because he "had no choice. I was told what to do." *Id.; see also* 7/14/97 Cobb Dep. at 48. In that King has advanced no formal coercion or duress defense here, *see Fields v. Thompson,* 164 Ga.App. 331, 332–33, 297 S.E.2d 100 (1982); *Evans v. Merrill Lynch,* 213 Ga.App. 808, 810, 446 S.E.2d 215 (1994), nor could he, *see Evans,* 213 Ga.App. at 810, 446 S.E.2d 215, the Court finds no factual dispute—only King's puerile semantics—on this point: plaintiffs and Citi–Chem in fact did reach the lockbox agreement that plaintiffs have described.[3]

### C. 1995–1996 Lockbox Problems

According to plaintiffs, Citi–Chem began to violate the lockbox agreement in late 1995. Carlson Aff. ¶ 13. They maintain that King, without their knowledge, directed Citi–Chem customers to send their payments to a New Jersey address that he controlled. Carlson Aff. ¶ 13.[4] Citi–Chem then failed to remit to

---

**3.** The evidence shows that, by their conduct spanning an extensive series of invoices and payments, the parties agreed to the remittance of Chemtall/Pearl River-based customer payables to the Georgia lockbox. That agreement is enforceable. *See Advance Security Inc. v. Superior Surgical Manufacturing Co., Inc.,* 197 Ga.App. 769, 771, 399 S.E.2d 488 (1990) (agreement formed over series of invoices accompanying inventory resupply was not so vague as to be unenforceable, and did not lack mutuality); *Gruber v. Wilner,* 213 Ga.App. 31, 34–35, 443 S.E.2d 673 (1994) (oral contracts can be taken out of the statute of frauds and thus be found enforceable by showing part performance); *Stephens v. Trotter,* 213 Ga.App. 596, 597, 445 S.E.2d 359 (1994); *Haehn v. Alheit,* 212 Ga.App. 252, 254, 441 S.E.2d 529 (1994); *Kolb v. Holmes,* 207 Ga.App. 184, 185, 427 S.E.2d 562 (1993).

**4.** According to a former Citi–Chem employee, King directed his employees to send letters to customers instructing them to remit payments directly to Citi–Chem in New Jersey. *See* L. Miller Aff. (CV496–192 doc. # 75, exh. 34) ¶ 9 &

exh. B; *see also* 3/12/97 King Dep. at 67 (identifying her as a secretary employed until 1/23/97). At the same time, King kept plaintiffs in the dark on this. Miller Aff. ¶ 9.

This negated the parties' established practice. As mentioned in note 2 *supra,* Citi–Chem was supposed to (a) send an invoice to each customer upon Chemtall/Pearl River's shipment of product; (b) on that invoice instruct the customer to remit to the Georgia lockbox; and (c) at the same time, send a duplicate invoice to plaintiffs, who would then match it up with the ensuing customer remittance so they could then make the appropriate revenue splits.

That process changed in late 1995, when Citi–Chem employees began to send plaintiffs their usual copy of each customer invoice, but then pasted a special label on the customer's invoice. The label covered the Georgia lockbox payment address and instructed the customer to remit to a New Jersey P.O. Box controlled by Citi–Chem. *Id.* ¶ 11, 427 S.E.2d 562; *see also* CV496–218 doc. # 37, exhs. 7 & 9; CV496–218 7/14/97 Stackhouse Dep. at 17–27; Miller Aff. (CV496–

Chemtall/Pearl River their share of the revenues. *Id.* ¶ 18. These diversions continued into 1996, though they were not uniform. In a 4/29/96 letter to a Los Angeles municipal customer, Citi–Chem instructed it to send its remittance to the Georgia lock box. CV496–192, doc. # 56, exh. 11. Carlson had called Citi–Chem and requested that this be done. 7/14/97 Stackhouse Dep. at 27–28. Plaintiffs claim that this was one of the factors that induced them to continue shipping their products to Citi–Chem customers. CV496–192, doc. # 59 at 7.

Nevertheless, it was just one week later that Citi–Chem instructed a Louisiana municipal customer to remit payments directly to Citi–Chem. CV496–192, doc. # 56, exh. 12. And, a Citi–Chem agent also verbally contacted another customer—the City of New Orleans—to likewise remit to Citi–Chem, and not to the lockbox address. CV496–192, doc. # 59 at 7; # 56, exh. 12 (handwritten notation);[5] 7/14/97 Stackhouse Dep. at 51–52.

### D. "Shifting Testimony"

#### (1) Calvin King

In his January, 1997 deposition King initially denied knowledge of the above-mentioned lockbox diversions, *see* 1/28/97 King Dep. at 81, but then agreed that Citi–Chem received remittances directly, *id.* at 82, though he insisted that they were not for Chemtall or Pearl River products. *Id.* at 83. A moment later, however, King conceded that Citi–Chem diverted one payment for Pearl River products and simply kept the money. *Id.* at 84–85 (admitting that Citi–Chem "used the money for operations").

Still, he refused to admit that he advised the customer in question to divert payment from the lockbox to Citi–Chem. *Id.* at 99. And, he denied that he ever directed any customer to ignore the lockbox address and instead remit directly to Citi–Chem. *Id.* at 101, 104–05; *id.* at 118–19 (denying any knowledge that Citi–Chem's bookkeeper, L. Stackhouse, wrote a Los Angeles municipal customer and instructed it to remit to Citi–Chem instead of the lockbox); *id.* at 223 ("Q. Do you know of any efforts after [8/15/96] to contact Citi–Chem's customers directly and tell them to mail the money direct to [Citi–Chem's P.O. Box in] Cherry Hill [N.J.]? A. I don't know of any specific instance, no. I don't recall any").

As for why, after four years (1991–1995), numerous Citi–Chem customers supplied with Chemtall/Pearl River products "suddenly" stopped remitting to the lockbox and instead remitted to Citi–Chem, King claimed ignorance. 1/28/97 King Dep. at 180–81. In other words, having denied that he or a Citi–Chem employee or agent directed them, he simply could not explain how Citi–Chem's customers "spontaneously" began remitting to Citi–Chem's New Jersey P.O. Box rather than to the Georgia lockbox address. *See, e.g.*, 1/28/97 King Dep. at 142 ("Q. How do you believe that L.A. Water and Power started to send checks directly to Citi–Chem in New Jersey rather than to the [Georgia] lockbox? A. I don't know"); *see also id.* at 150, 159–60. King suggested that perhaps his customers were "incompetent":

Q. And you have no idea as to how a customer who gets an invoice telling them to mail it to P.O. Box 93146, Atlanta, ends up sending money to P.O. Box 3836 [N.J.], assuming that to be the case?

A. Do I know?

Q. Yes, sir.

A. Incompetence, perhaps.

Q. On the part of the customers?

A. Right.

*Id.* at 145.

Even though he repeatedly denied knowledge or complicity in those diversions, King

192 doc. # 75, exh. 34 (King personally directed this special labeling "so that the customer would send the money directly to [Citi–Chem] . . ."); *id.* ¶ 11, 427 S.E.2d 562 & exh. D; *see also* CV496–218 doc. # 37, exh. 8. For a time, this "dummy invoice" system deterred plaintiffs from realizing that the customer payments were bypassing the lockbox. *Id.* at 27.

5. The parties have stipulated that third-party documents offered as exhibits are authentic, thus dispensing with the "need to present an evidentiary foundation for [them] at trial." CV496–218, doc. # 40, exh. A (Stipulations) ¶ (b).

nevertheless repeatedly conceded that hundreds of thousands of dollars were diverted from the lockbox to Citi–Chem. Indeed, he authored a 4/29/96 memo admitting that Citi–Chem had collected $656,621.34 in invoices constituting money Citi–Chem now owes to Chemtall/Pearl River. 1/28/97 King Dep. at 114–117, 149, 177 & exh. 54; 1/29/97 King Dep. at 256–57; 1/28/97 King Dep. at 185–86 (further conceding that all of the $656,621.34 in Chemtall/Pearl River-based customer payments listed on his 4/29/96 memo were remitted directly to his company in New Jersey, and not the Georgia lockbox). And he did not dispute Pearl River's computation showing that Citi–Chem owes it $1,259,854.05 in customer remittances that Citi–Chem failed to turn over to Pearl River. 1/28/97 King Dep. at 140–42.

King also conceded that plaintiffs were not informed of the diversion; he justified this by insisting that somehow the lockbox agreement dissolved, as did his obligation to communicate that belief to the plaintiffs. This is reflected in his rhetorical response, "Why did I *have* to inform them?" 1/28/97 King Dep. at 186 (emphasis added). When pressed again on this point, King retreated to his now oft-used "I don't recall" response:

Q. Did you ever inform [plaintiffs] [prior to the spring of 1996] that [the payments were not] going to the Atlanta lockbox?

. . . .

A. I don't recall.

*Id.* at 188.

He admitted, however, that at the end of 1995 he decided to direct Citi–Chem's bookkeeper, L. Stackhouse, to cease sending customer remittance funds to the plaintiffs. 1/28/97 King Dep. at 189–90.

To summarize thus far: somewhere in the 1995–1996 time period, King decided that he no longer had to adhere to the lockbox agreement, but felt no obligation to inform plaintiffs of this decision. In the meantime, the company he owned and controlled collected more than a million dollars in diverted customer remittances that "just happened" to come his way "perhaps" due to customer "incompetence." And, he either had no part

in the diversions or did but "just can't recall."

### (2) Citi–Chem's Pre–Litigation Correspondence

Intermixed with King's deposition denials and contradicting concessions is his testimony concerning a 4/29/96, "remit to the lockbox" letter that Citi–Chem sent to its customers. King initially denied ever seeing it before. 1/28/97 King Dep. at 175–77. However, he later conceded that, pursuant to what he characterized as a "work out agreement," Citi–Chem in fact did mail the letter to its Chemtall/Pearl River-supplied customers. Citi–Chem did so after being confronted by plaintiffs, and thus to assure them that the customer revenues in fact would be remitted to the lockbox. 1/29/97 King Dep. at 266–67; *see also* 1/28/97 King Dep. exh. 54 at 3.

### E. Other Citi–Chem Pre–Litigation Representations

As the 4/29/96 memo and "remit to the lockbox" letter reveal, plaintiffs confronted King prior to commencing this litigation. At that time King admitted, through counsel, that Citi–Chem had been receiving "lockbox" payments directly from its customers. CV96–192, doc. 56, exh. 1 (Carlson Aff.) ¶ 20 & sub-exh. A (Citi–Chem's counsel's 5/1/96 Ltr. at 2:"[Citi–Chem] has recently received $70,000 in checks for some of the Pearl River invoices. These amounts can be sent immediately as a gesture of good faith and our desire to cooperate with [Pearl River]"). This followed King's 4/29/96 memo to Carlson, wherein King admitted receiving payment for hundreds of thousands of dollars worth of Chemtall/Pearl River invoices. CV496–218 doc. # 37, exh. 1 ¶ 11, sub-exh. B; CV496–192, doc. # 56, exh. 1, sub-exh. A, 2nd attachment (totaling $656,621.34), exh. 2 (4/29/96 King memo to Carlson itemizing invoices for which Citi–Chem had received payment); CV496–218 7/14/97 Stackhouse Dep. at 45–46.

By the date of King's 4/29/96 memo acknowledging that invoice payments to the lockbox were $656,000 behind, CV496–192, doc. # 56, exh. 1 (Carlson Aff.), sub-exh. A

at 1; exh. 2; 1/28/97 King Dep. at 112–114, the parties were negotiating in an effort to resolve the dispute. *See* CV496–192 doc. # 56, exh. 1 (Carlson Aff.) sub-exh. A (Talty Letter). In a 5/1/96 letter-response to plaintiffs' inquiry about what had become of the money (i.e., if Citi–Chem's customers were being properly invoiced, then where were the invoice payments?), Citi–Chem's counsel, Dennis Talty, acknowledged the diversions but emphasized that the lockbox agreement was not "written," and in any event plaintiffs simply must have been aware of the diversions since they had been accepting checks directly from Citi–Chem. CV496–192, doc. # 56, exh. 1, sub-exh. A at 1. But he also insisted that Citi–Chem had nothing to do with the customer-payment diversion:

> *Lastly, [the] remittance address of the lockbox appears on all invoices.* Therefore, the failure of monies going to the lockbox representing your client's invoices is not a new development, was *not* a result of any action or conduct on the part of Citi–Chem and was a fact known to your client for several months or which could have been ascertained had sufficient controls been in place.

CV496–192, doc. # 56, exh. 1, sub-exh. A at 2 (emphasis added).

By this point in time, however, the plaintiffs had not yet uncovered what Citi–Chem's former employees have since revealed: the "dummy" invoice re-labeling scheme, which obviously contradicts Talty's claim i.e., because of the "dummy"-invoicing scheme, the "remittance address of the lockbox [in fact did *not* ] appear[ ] on *all* invoices," *id.,* only the "dummy" invoices that Citi–Chem had sent to plaintiffs, while, at the same time, *Citi–Chem* 's payment address appeared on

the invoices that Citi–Chem sent to its customers. Nor did plaintiffs know that Citi–Chem had diverted a substantial amount of customer payments from the lockbox. *See* 7/14/97 Stackhouse Dep. at 73–74.

### F. Diverting Corporate Resources

It was also in May 1996 that King instructed his employees to activate a "Citi–Chem, Inc., D.C." bank account (hereafter, the "CCI–DC account"),[6] for the deposit of Citi–Chem, Inc. funds. CV496–192 doc. # 74 (Miller Aff.) ¶ 14; *see also* 7/14/97 Cobb Dep. at 27. This followed Carlson's trip to New Jersey to investigate what became of the missing customer payments. Miller Aff. ¶ 14; 7/14/97 Stackhouse Dep. at 58–59. Citi–Chem's then bookkeeper has since testified that King set the CCI–DC account up to hold the diverted lockbox revenues. 7/14/97 Stackhouse Dep. at 58–59, 69–70. "Lockbox" customer payments went directly into that account. 7/14/97 Stackhouse Dep. at 74–76;[7] 7/14/97 Cobb Dep. at 33. With King's knowledge, customers were instructed to make their checks out to CCI–DC, and this continued past Citi–Chem's bankruptcy filing. 7/14/97 Cobb. Dep. at 36–37.

At the same time, King also set up new businesses. One was called "King's Liquors." Miller Aff. ¶ 15.[8] Another was a clothing store called "Sport–King." 7/14/97 Stackhouse Dep. at 69–70. Multiple payments of "around ten or more" thousand dollars in CCI–DC monies were transferred to Sport–King. 7/14/97 Stackhouse Dep. at 66–67; Stackhouse Aff. (CV492–192, doc. # 72) ¶ 9 ("$69,000 of this money was used for Sport[-]Kings...."); *but see* 3/12/97 King Dep. at 79–80 (King testified that only

---

**6.** King set up CCI–DC in 1985 to pursue what evidently constituted ·minority set-aside, "sheltered market" business in the Washington, D.C. area. 3/12/97 King Dep. at 86–87. Other than submitting some bids, however, King did not use CCI–DC until "early 1996." 3/12/97 King Dep. at 75, 88–89.

**7.** On cross, Stackhouse backpedaled somewhat, noting that plaintiffs had cut off their shipments but, upon Citi–Chem's prepayment, resumed shipping during the summer of 1996. 7/14/97 Stackhouse Dep. at 84–85. She then conceded that she could not be certain which diverted

payments were for prepaid products and which were not. *Id.* at 85–86; *see also* 3/12/97 King Dep. at 28 (King insisting that plaintiffs failed to send Citi–Chem, then operating as CCI–DC, its share of revenues "even though [at that time] we were pre-paying...."); *id.* at 99; 7/14/97 Cobb Dep. at 75–79.

**8.** From her involvement with that undertaking, Citi–Chem's former Administrative Assistant (Ms. Miller) suspects that at least some of Chemtall/Pearl River's monies were diverted into that entity. *Id.; but see* 7/14/97 Cobb Dep. at 47.

his wife owns Sport–King, and that only one CCI–DC check had been "inadvertently" written to it but "I returned the money"). King also transferred, via payment to himself as a "consulting fee," $45,000 "to fund King's Liquors." Stackhouse Aff. (CV492–192, doc. # 72) ¶ 10. And, he used $6,000 in CCI–DC funds "to purchase a BMW." *Id.* ¶ 9. In June and July, 1996, King transferred two automobiles out of Citi–Chem and into his own name, 1/28/97 King Dep. at 23–24, though he claims that he cannot remember what he paid Citi–Chem for them, nor what he received for them when he shortly thereafter sold one to Ms. Miller and the other to his daughter. 1/28/97 King Dep. at 25–28.

### G. Plaintiffs File Suit

Claiming a $152,082.80 arrearage (doc. # 37, exh. 1 ¶ 16) and breach of contract, Chemtall sued Citi–Chem and King in a Georgia State court on 8/9/96 (CV496–218 doc. # 37, exh. 1, sub-exh. A) and obtained several Temporary Restraining Orders ("TROs") aimed at preventing them from accepting any more direct payments from Citi–Chem customers for Chemtall products, or otherwise diverting any more funds away from the lockbox. CV496–218 doc. # 37, exh. 3 at 3–5 (8/15/96, 8/19/96 & 8/22/96 orders). The State court essentially ordered the defendants, *inter alia,* to ensure that Chemtall-based customer revenues be sent to the lockbox. *Id.,* doc. # 5 at 1–2. On 9/5/96, Citi–Chem notified its customers that (1) it was aware of the fact that its customers had been mailed a copy of one of the above-mentioned TROs, but that (2) such should be disregarded because they "only hold[ ] jurisdiction in the state of Georgia." CV496–192 doc. # 75, exh. 35.

Claiming diversity jurisdiction, Pearl River instituted similar proceedings in this Court on 8/9/96, seeking $1,162,625.99. CV496–192 doc. # 1 (Complaint). In both cases the plaintiffs have since amended the Complaints to allege fraud, conversion, constructive trust and related theories. CV496–218 doc. 54, 69 at 2; CV496–192 doc. # 7, 66.

Citi–Chem filed for bankruptcy in New Jersey on 9/9/96. CV496–192 doc. # 18; # 56, exh. 14 (Savage Aff.) ¶¶ 5–6. King would later justify Citi–Chem's defiance of the State court injunction by claiming that "the law allowed it after [Citi–Chem] filed [a Chapter 11 Bankruptcy Petition]." 1/28/97 King Dep. at 225. Although King put the company in Chapter 11, he failed to open a debtor-in-possession account for incoming revenues. 1/28/97 King Dep. at 41. He also wrote to the Georgia "lockbox" bank to terminate the lockbox itself. 1/28/97 King Dep. at 61. And, he later requested that Citi–Chem be liquidated under Chapter 7 of the Bankruptcy Code. 1/28/97 King Dep. at 62–63. According to the bankruptcy trustee, however, King failed to inform the bankruptcy court or the trustee that he had activated CCI–DC and shifted Citi–Chem's business into it. *See* CV496–192, doc. # 64, exh. A.

Citi–Chem and King removed the *"Chemtall"* State court proceeding to this Court, CV496–218, doc. # 1, and King has since moved to dismiss (CV496–218 doc. # 6, 15), as well as for a stay pending disposition of Citi–Chem's N.J. bankruptcy proceeding. CV496–218, doc. 43–44. Several discovery disputes have since erupted in the instant cases, resulting in sanctions imposed against King for stalling or evading discovery. *See infra* note 18.

### H. Facing *Some* of The Music

By the time King was re-deposed in March, 1997, he admitted that, beginning in 1996 he diverted Citi–Chem business to CCI–DC in response to plaintiffs' pursuit of Citi–Chem for the revenues claimed here. 3/12/97 King Dep. at 89–92; 99–100 (plaintiffs began contacting Citi–Chem's customers, so King shifted Citi–Chem's business to CCI–DC to avoid plaintiffs' "interference"); *see also* CV496–192 doc. # 73 (L. Miller Aff.) ¶ 14.[9] This in no small part enabled King to pay himself "consulting fees" out of the CCI–DC account. CV496–192 doc. # 75, exh. 41 ¶¶ 1–6 (Citi–Chem's former bookkeeper's affidavit recounting King's direction to set up the CCI–DC account, run virtually all Citi–

---

**9.** The existence of a similarly named, parallel company surprised the bankruptcy trustee's

counsel. 3/12/97 King Dep. at 76 (he did not learn of CCI–DC until 3/11/97).

Chem transactions through it, and draw his "consulting fees" checks from it).

In that respect, plaintiffs have submitted a schedule of checks dated between 8/12/96 and 11/27/96 showing $110,900 in payments from the CCI–DC account to King. Doc. # 37, exh. 22. This is in addition to a $75,000 CCI–DC check to King issued on 12/11/96. CV496–192 doc. # 75, exh. 40; exh. 41 (L. Stackhouse Aff.) ¶¶ 9–10 (recounting how King "laundered" $75,000 and $45,000 "consulting fee" checks).[10] King at best was equivocal about what corporate formalities he observed. See 3/12/97 King Dep. at 46 (denying that "there [was] any kind of consulting agreement or contract that was in effect between [King] and CCI–DC"); id. at 46–49 (after King's counsel asked whether that question encompassed only "written agreements," King claimed that he "thought" the question was limited to "written" agreements, then admitted that—pursuant to what King evidently views as an "oral" agreement between himself and CCI–DC—he in fact had submitted "invoices" from himself to CCI–DC for his "consulting" fees); id. (King justifies this by insisting that he at that time acted as a "one-man sales force" to preserve both Citi–Chem and CCI–DC's business; he insists that, by the time he received the 11/96 CCI–DC "consulting" payments, he was "acting as a consultant for [CCI–DC]" and also as a CCI–DC salaried employee).

### I. Other Corporate Resources

King claimed that he could not explain what a 12/31/96, $832,187.48 "Management Fee Expense" disbursement from Citi–Chem's coffers represented, 1/28/97 King Dep. at 142, but later indicated that it was paid to CCI–DC. Id., at 214, 216; but see 3/12/97 King Dep. at 18–21 (denying that any fees "out of the ordinary" were paid by Citi–Chem to CCI–DC, though he conceded that he transferred Citi–Chem business and resources to CCI–DC because "we were being, you know, chased; hounded. Our accounts

were being stolen [by plaintiffs]"); 3/12/97 King dep. at 43 (testifying that he was unable to identify "numerous references to ... Management Fee, Inc."); but see id., at 44–46 (conceding that he charged CCI–DC "consulting fees" for his efforts and that this continued after CCI–DC took over Citi–Chem's business in 1996); CV496–192, doc. # 64, exh. A. (copy of 4/29/97 Trustee's Adversary Proceeding Complaint to extend bankruptcy proceedings from Citi–Chem to CCI–DC and to recover "compensation to [Citi–Chem's] estate for fraudulent transfer of property"); id. at 4 (demanding "judgment against Calvin King for a sum sufficient to compensate [Citi–Chem's bankruptcy] Estate for ... losses [arising from 11 U.S.C. § 548, pre and post-petition transfers and State common law fraud]").

### J. King's Continued Business Activities Under CCI–DC

Among the various motions filed in this case are plaintiffs' Motions To Strike, CV496–192, doc. # 58, 74; CV496–218, doc. 35, 75, 77, which are in part based on their claim that King has committed perjury, most particularly with respect to his testimony and actions surrounding CCI–DC. Hence, some further detail on that set of facts is warranted here. To reiterate, King created CCI–DC as a "parallel Citi–Chem" company (i.e., a second company which used the same "Citi–Chem" name) in 1985 but did not actually use it in any significant way until early 1996. See supra note 6.

While being deposed, King differentiated between Citi–Chem and CCI–DC. See 3/12/97 King Dep. at 7; see also CV496–192, doc. # 55 at 10–11. But to the public the two corporations not only used the same name, 3/12/97 King Dep. at 7, but also the same employees and principal place of business. Id. at 15, 25. Both are fully owned by King, Id. at 12, and both sell water treatment polymers. Id. at 10.

---

10. King's former employees have also illuminated several other highly questionable activities. According to Miller, King also instructed her to falsify product specification certifications, thus falsely representing to Citi–Chem customers that

they were receiving Chemtall/Pearl River-manufactured products which in fact were produced by a third party. CV496–192 doc. # 74 (Miller Aff.) ¶ 16.

Plaintiffs illuminate evidence showing that King filtered Citi–Chem business and revenues through CCI–DC months before he placed Citi–Chem in bankruptcy. *See, e.g.,* 7/14/97 Stackhouse Dep. at 75–76 ("lockbox-bound" revenues were diverted into the CCI–DC entity's account both before and after Citi–Chem's 9/96 bankruptcy filing). They then underscore King's contradictory testimony regarding that commingling. At one point King testified that "CCI–DC" was a separate entity from Citi–Chem, 1/28/97 King Dep. at 172, and that it maintained a corporate checking account at a Washington, D.C. bank. *Id.* And, at that time he claimed that CCI–DC did not have any customer accounts. *Id.* As mentioned above, however, he later admitted that he used CCI–DC to carry on Citi–Chem's business once Citi–Chem effectively terminated operations upon its Chapter 11 bankruptcy filing. And, as the Trustee's filings show, he evidently did not inform the bankruptcy court.

In that regard, Pearl River obtained, as a creditor in Citi–Chem's bankruptcy, a copy of CCI–DC'S check register showing that, during 1996, CCI–DC paid nearly $500,000 to other water treatment polymer manufacturers for their products.[11] CV496–192, doc. # 55 at 11–12; doc. # 56, exh. 18. Pearl River also obtained, from a third-party supplier of CCI–DC, documentation showing that King opened a second CCI–DC checking account at a N.J. bank. CV496–192, doc. # 59 at 10; # 56, exh. 15. For all intents and purposes, plaintiffs contend, King simply siphoned off Citi–Chem's assets and business contacts, then resumed its operation under CCI–DC's name, *See* CV496–192, doc. # 59 at 9–14, even though he denied, in his 1/28/97 deposition, that he was selling any more polymers. 1/28/97 King Dep. at 162.

It is against this background that plaintiffs express special dismay over King's insistence, during his 1/28/97 deposition, that the original Citi–Chem (i.e., the defendant in the instant cases), had ceased doing business following its 1/6/97 Chapter 7 bankruptcy liquidation, and his further representation that CCI–DC did not have any customer accounts. 1/28/97 King Dep. at 162, 172; CV496–192, doc. # 59 at 9–14. In fact, Citi–Chem did continue doing business, only through CCI–DC, which then paid King massive amounts of "consulting fees." Plaintiffs point to, *inter alia,* this testimony:

Q. And are you doing any business in [CCI–DC's] name as we speak?

A. In their name?

Q. Yeah.

A. We picked up a couple of accounts I think—no. I'm sorry. We didn't. We didn't get the accounts.

Q. Does [CCI–DC] have any accounts?

A. No.

1/28/97 King Dep. at 172.

This and similar testimony, plaintiffs contend, was designed to mislead them away from a potential source (i.e., CCI–DC) from which to recover the over $1 million in revenues Citi–Chem, through King, admitted to diverting.[12] They argue that such testimony, combined with King's other bad faith and obstructionistic discovery tactics, justify striking King's Answer as a perjury/discovery sanction. *See* CV496–192, doc. # 59 at 9–14.

### K. "Consulting Fee" Payments While Obstructing Discovery

Plaintiffs also point to King's "consulting fee" payments in support of their strike motions—specifically the context in which he paid himself those fees. After plaintiffs commenced these actions, King's inconsistent testimony, constant "I don't recall" responses and obstructionistic discovery tactics (i.e., baseless objections, resulting in sanctions, *see infra* note 18; constant deposition rescheduling, *see* CV496–192, doc. # 35 at 2–5), compelled them to discover much of the above-cited information from third parties.

---

**11.** As Ms. Stackhouse testified, Citi–Chem had to turn to other polymer suppliers after plaintiffs terminated shipments to Citi–Chem customers in late May or early June, 1996. CV496–218, 7/14/97 Stackhouse Dep. at 22.

**12.** In Georgia, "money can be the subject of a conversion claim as long as the allegedly converted money is specific and identifiable." *Hudspeth v. A & H Const., Inc.,* 230 Ga.App. 70, 71, 495 S.E.2d 322 (1997) (quotes and cite omitted).

Plaintiffs have enumerated their efforts, *see* CV496–192, doc. # 59 at 14, including their need to file successive motions to compel discovery. *See* CV496–192, doc. # 59 at 14; note 18 *infra.*

In that vein, plaintiffs have had to depose King three times, and, as they point out, CV496–192, doc. # 59 at 15–16, many of his objections and non-responsive answers, combined with his deposition scheduling delays, enabled him to continue doing business under CCI–DC so he could pay himself substantial consulting fees. For example, during the latter half of 1996, and while plaintiffs attempted to depose him, King furthered CCI–DC's business by servicing former Citi-Chem customers and paying himself more than $110,000 in "consulting fees." CV496–192, doc. # 59 at 16; doc. # 56, exh. 22. In its 5/12/97 Motion For Contempt, Chemtall has presented the Court with evidence showing that $146,458.97 of Citi–Chem customer revenue funds were deposited into CCI–DC accounts—funds traceable to Chemtall/Pearl River product shipments. CV496–218, doc. # 34 at 5.

## II. *ANALYSIS*

### A. Personal Jurisdiction Challenge

King does not challenge subject-matter jurisdiction, CV496–218, doc. # 40, Stipulations ¶ (c), but argues that this Court is without personal jurisdiction over him. CV496–218, doc. # 6; CV496–192, doc. # 36. He swears that, while he thrice visited Chemtall's Riceboro facility, each visit was "unscheduled" —something he did merely while passing through Georgia on his way to service a Florida customer. CV496–192, doc. # 36, exh. A (King Aff.) ¶¶ 5–6.

Thus, he stands before this Court as a nonresident who has "never been in [Georgia] to negotiate any agreements or orders with [Chemtall/Pearl Rivers]." King Aff. ¶¶ 4–5. He does not deny, however, that Citi–Chem engaged in a multi-year long, steady stream of orders, billings, payments, and correspondence between Riceboro, Georgia, and Citi–Chem's N.J. offices. King Aff. ¶ 8. But, he emphasizes that "[a]lmost all of

the orders were placed by Citi–Chem's orders clerk, and not by me." King Aff. ¶ 9.

As for Pearl River's case against him, he points out that "[a]ll of the [disputed] orders" in the *Pearl River* action were shipped from Pearl River's Louisiana plant to non-Georgia customers. King Aff. ¶ 10. King does not reference, however, the now undisputed fact that Citi–Chem participated in a multi-year arrangement whereby it received Pearl River billing from Riceboro, Georgia, then directed its customers to remit Pearl River-based product payments to the Georgia lockbox.

King also invokes the corporate veil by insisting that he signed the lockbox agreement while in N.J. and only in his capacity as Citi–Chem's president. King Aff. ¶ 11. The plaintiffs, he points out, managed the lockbox at its Georgia site, not he. King Aff. ¶ 13. Again, King does not reference the fact that he managed the lockbox early on, until Chemtall took the task away from him. In any event, his arguments implicate the evidentiary burdens and standards governing the establishment of personal jurisdiction, as well as application of corporate veil-piercing doctrines.

### 1. Personal Jurisdiction—Governing Standards

■ A federal court can exercise personal jurisdiction over a nonresident defendant only after it first determines that the forum State's Long Arm statute authorizes jurisdiction and doing so will not violate the defendant's due process rights. *Sculptchair, Inc. v. Century Arts. Ltd.,* 94 F.3d 623, 626 (11th Cir.1996); *Abraham v. Agusta,* 968 F.Supp. 1403, 1406 (D.Nev.1997); *Allegiant Physicians Services, Inc. v. Sturdy Memorial Hosp.,* 926 F.Supp. 1106, 1112 (N.D.Ga.1996). No such violation occurs where the defendant has purposefully established minimum contacts with the forum State so that exercising personal jurisdiction would not offend traditional notions of fair play and substantial justice. *Sculptchair,* 94 F.3d at 626; *cf. U.S. S.E.C. v. Carrillo,* 115 F.3d 1540, 1542 (11th Cir.1997) (applying same analysis in "alien defendant," F.R.Civ.P. 4(k) context).

Courts analyze a defendant's contacts with the State under "general" and "specific" jurisdictional inquiries. *See Smith v. Hobby Lobby Stores, Inc.,* 968 F.Supp. 1356, 1360 (W.D.Ark.1997); *Allegiant,* 926 F.Supp. at 1113 n. 3. General jurisdiction simply refers to the power of a State to adjudicate a cause of action involving a particular defendant, regardless of where the cause of action arose. *Smith,* 968 F.Supp. at 1360; *see also Carrillo,* 115 F.3d at 1542 n. 2.

On specific jurisdiction, courts focus on the relationship among the defendant, the forum and the litigation. A defendant's contacts must (1) be related to the cause of action or have given rise to it; (2) involve some act by which he purposely availed himself of the privilege of conducting activities within the forum, thus invoking the protection and benefits of its laws; and (3) be such that he should reasonably anticipate being haled into a forum-State court. *Allegiant,* 926 F.Supp. at 1113; *Smith,* 968 F.Supp. at 1359–60; *Rudo v. Stubbs,* 221 Ga.App. 702, 704, 472 S.E.2d 515 (1996). Sitting in diversity jurisdiction, this Court must apply the law of the forum State—Georgia—to determine whether it has personal jurisdiction over a nonresident defendant. *Brady v. Burtt,* 979 F.Supp. 524, 528 (W.D.Mich.1997).

Since plaintiffs have presented, *inter alia,* a breach of contract claim, CV496–192, doc. # 1, Counts Two—Three; CV496–218, doc. # 1 (Complaint) Count Two, the "transacting business" provision of Georgia's Long Arm statute applies. *See* O.C.G.A. § 9–10–91(1). That statute confers personal jurisdiction to the maximum allowed by the Due Process Clause. *Allegiant,* 926 F.Supp. at 1113. The same must be said for tortfeasor analysis under § 9–10–91(3), *see Urspruch v. Greenblum,* 968 F.Supp. 707, 710 (S.D.Ga.1996), as plaintiffs also have raised tort claims. CV496–192, doc. # 66, Counts Seven – Eight; CV496–218, doc. # 54, Counts Five – Nine.

### 2. Personal Jurisdiction—Burden of Proof

Because this Court has chosen not to conduct a discretionary evidentiary hearing, but instead has allowed plaintiffs to conduct discovery in support of their jurisdictional allegations, *see* 2 Moore's Federal Practice 3d § 12.31[7] (1997); *Doddy v. Oxy USA, Inc.,* 101 F.3d 448, 460 (5th Cir.1996); *Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1367 (11th Cir.1997),

[plaintiffs] have the burden of establishing a prima facie case of personal jurisdiction over [King]. *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990); *Morris v. SSE, Inc.,* 843 F.2d 489, 492 (11th Cir.1988), *appeal after remand,* 912 F.2d 1392 (11th Cir.1990); *Delong Equip. Co. v. Washington Mills Abrasive Co.,* 840 F.2d 843, 845 (11th Cir.1988). To do so [they] must present enough evidence to withstand a motion for directed verdict. *Madara,* 916 F.2d at 1514. The Court must accept as true all facts alleged in the complaint that are uncontroverted by the defendant's affidavits. *E.g., Madara,* 916 F.2d at 1514; *Cable/Home Communication Corp. v. Network Prod., Inc.,* 902 F.2d 829, 855 (11th Cir.1990). Where, however, the defendant's affidavits and the plaintiff's assertions conflict, the Court must construe all reasonable inferences in favor of the plaintiff. *E.g., Madara,* 916 F.2d at 1514; *Cable/Home Communication,* 902 F.2d at 855.

*Willingway Hosp. Inc. v. Blue Cross & Blue Shield of Ohio,* 870 F.Supp. 1102, 1103–04 (S.D.Ga.1994) *accord, Lisseveld v. Marcus,* 173 F.R.D. 689, 695 (M.D.Fla.1997). The Court "may determine the jurisdictional issue by examining affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Doddy,* 101 F.3d at 460.

### 3. Piercing The Corporate Veil

Part of the Court's jurisdictional analysis turns on application of corporate veil-piercing doctrine to King, since he has invoked the corporate veil in support of his jurisdictional and "Stay" motions. *See* CV496–192, doc. # 61 (King's "Stay" brief); doc. # 36–37 (motion, brief and affidavit arguing that, because he dealt with plaintiffs in his capacity only as Citi–Chem's representative, he himself cannot be subjected to personal jurisdiction, much less substantive liability); *see also* doc. # 64 (plaintiffs' response brief) at 3–4

(citing *Moore v. Barge*, 210 Ga.App. 552, 554, 436 S.E.2d 746 (1993)).

■ This veil-piercing concept drives the Court's consideration of King's jurisdictional motion (as well as his bankruptcy-based stay motion, *see infra* Part II(B)). "In general, the activities of an officer on behalf of a corporation do not confer jurisdiction over the officer individually." *Brady*, 979 F.Supp. at 529. However, if King pierced his corporate veil prior to the commencement of these proceedings, such conduct may be considered to the extent it impacted plaintiffs in Georgia. Furthermore, one who "is sued in his personal capacity, whether the alter ego, an officer or agent of a corporation, may not escape personal liability for his tortious misconduct damaging … third parties by hiding behind the corporate veil even in those situations where the corporation might also be a proper party to the action." *Moore*, 210 Ga.App. at 554, 436 S.E.2d 746 (internal quotes and cite omitted).

■ Sole shareholdership alone is not dispositive on a commingling-based, veil-piercing claim. "There must be evidence of abuse of the corporate form. [In other words,] [p]laintiff[s] must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." *Heyde v. Xtraman, Inc.*, 199 Ga.App. 303, 306, 404 S.E.2d 607 (1991) (internal quotes & cites omitted).

■ Aside from commingling, plaintiffs also can show that King is directly liable because he personally participated in a tort or directed his corporations (and thus, corporate employees and agents under his control) to do so:

"[a] corporate officer 'who takes part in the commission of a tort by the corporation is personally liable therefor, but an officer of a corporation who takes no part in the commission of a tort committed by the corporation is not personally liable unless he specifically directed the particular act to be done or participated or cooperated therein (or if he disregarded the corporate form so as to authorize piercing of the

corporate veil).' … [Cit.]" *Fussell v. Jones*, 198 Ga.App. 399(1) (401 S.E.2d 593) (1991). *See also Lincoln Land Co. v. Palfery*, 130 Ga.App. 407, 411(1)(a) (203 S.E.2d 597) (1973).

*Weir v. McGill*, 203 Ga.App. 431, 432, 417 S.E.2d 57 (1992); *accord Jennings v. Smith*, 226 Ga.App. 765, 766, 487 S.E.2d 362 (1997).

As an example, the corporate veil can be pierced where a corporate officer participates with his corporation in wrongfully converting another's property, *see DCA Architects, Inc. v. American Bldg. Consultants*, 203 Ga.App. 598, 600, 417 S.E.2d 386 (1992); CV496–218, doc. # 54, Count Five (Conversion); CV496–192, doc. # 66, Count Nine (Constructive Trust), and no personal benefit need be shown:

It is unnecessary to show that the defendant applied it to his own use, if he exercised dominion over it in defiance of the owner's right, or in a manner inconsistent with it. It is in law a conversion whether it be for his own or any other's use.… Thus, there is no requirement that a corporate officer personally profit from the conversion of property, only that he participate in or direct the commission of the act.

*Id.*, 203 Ga.App. at 600, 417 S.E.2d 386 (quotes and cites omitted).

Courts nationwide generally subscribe to the same bottom line: those who commingle corporate assets, take actions to hinder or defraud creditors, disregard corporate formalities, directly engage in tortious conduct (or direct their company to do so), or otherwise abuse the corporate form for an unethical or illegal purpose, will pierce the corporate veil which otherwise insulates them from personal liability. *See Thoni Trucking Co. v. Foster*, 243 F.2d 570, 571 (6th Cir.1957) (where, shortly after dominant stockholder learned of accident and expected claims against his company, he drained it of assets under the guise of salaries and dividends, then transferred remaining assets to his other corporation, and also misled plaintiffs through correspondence, he reduced the corporate entity to a sham; the district court therefore properly disregarded that entity when it held the stockholder personally liable

for default judgments entered against the corporation); *Mitcham v. Blalock*, 214 Ga. App. 29, 34, 447 S.E.2d 83 (1994) ("The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has overextended his privilege in the use of a corporate entity in order to defeat justice, perpetrate fraud, or evade contractual or tort responsibility") (internal quotes and cite omitted); *J–Mart Jewelry Outlets, Inc. v. Standard Design*, 218 Ga. App. 459, 460–61, 462 S.E.2d 406 (1995); *B.J. Howard Corp. v. Skinner, Wilson & Strickland*, 172 Ga.App. 180, 182–83, 322 S.E.2d 306 (1984); *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 982–83 (11th Cir.1986); *Lawson v. Athens Auto Supply & Electrical, Inc.*, 200 Ga.App. 609, 612–13, 409 S.E.2d 60 (1991); *Seaside Industries, Inc. v. Cooper*, 766 S.W.2d 566, 568–69 (Tex.App.1989); Ann., *Stockholders' Personal Conduct of Operations Or Management of Assets As Factor Justifying Disregard of Corporate Entity*, 46 ALR 3d 428 § 5 (Appropriation or use of corporate funds or property for personal purposes); *id.* § 6 (Stripping Corporation of Assets); 6A .Ecyc. of Ga.L. §§ 61–62 (1997) (where an existing corporation is corrupted to commit torts, hinder and defraud creditors, or a new corporation is formed and used for that purpose, the corporate veil can be pierced and the controlling party can be held liable under Georgia law).[13]

Here the plaintiffs have adduced ample evidence showing that King abused the corporate form and pierced his own corporate veil—all while engaging in a steady stream of business and fraud-furthering contacts with this State. The Court need only reference the facts—most of them undisputed—as exhaustively detailed above. King obviously saw the plaintiffs closing in on the over $1 million in debt that he himself conceded at the time—debt comprised of the very customer invoice revenues that Citi–Chem, under King's direction, diverted. So, he reactivated CCI–DC and used it to siphon both funds and corporate accounts out of Citi–Chem and into CCI–DC so that he could continue to pay himself substantial "consulting fees" while hindering plaintiffs' recovery efforts. In addition, he lied to plaintiffs (i.e., through his lawyer-agent's 5/1/96 letter) as part of his then-mushrooming scheme to hinder, delay and defraud these creditors.

### 4. Personal Jurisdiction Over King

As the precedent cited above shows, King cannot escape "personal contacts" analysis by claiming he acted only in a "corporate capacity," or that one of his employees, not he, physically placed "most" of the Citi–Chem orders with the plaintiffs. Corporations are animated by people; those who control such corporations hire others to perform on the corporation's behalf. Hence, it is King, the controlling person, who is ultimately counted under the personal contacts analysis, for the evidence shows that he engaged in (directly and through his employees) fraud, deceit, and other veil-piercing conduct that exposes him to direct personal liability.[14]

In that respect, the Miller, Cobb and Stackhouse evidence alone shows that he pulled the strings and personally directed the fraudulent, "dummy" invoice scheme which, when combined with King's pre-litigation (e.g., the 4/29/96) memos and letters (most particulary the misleading 5/1/96 "Talty" letter), comprised a substantial number of fraud-furthering, conversion-causing contacts with this State. Those contacts occurred

---

**13.** In Georgia, the veil is both penetrable and circumventable. In a related context (parent corporation liability), the Georgia Supreme Court recently highlighted the availability of agency and joint-venturer theories to assist those whose evidence is otherwise insufficient to pierce the veil. *Kissun v. Humana, Inc.*, 267 Ga. 419, 479 S.E.2d 751 (1997).

**14.** The Court pauses to note that it is not reviewing the facts under F.R.Civ.P. 56, summary judgment standards, but rather under the preponderance of the evidence/F.R.Civ.P. 50 standard governing personal jurisdiction challenges. In contrast to a Rule 56 motion (where courts cannot engage in factfinding, and the facts and reasonable inferences are viewed in favor of the non-movant), courts not only find facts when deciding jurisdictional issues, but also view both the facts and inferences in favor of the party alleging jurisdiction (here, the plaintiffs). *See Lisseveld* 173 F.R.D. at 695; *Willingway* 870 F.Supp. at 1103–04. Relatedly, King's summary judgment motion, CV496–218, doc. 46–48, is addressed *infra*.

prior to the commencement of these cases and formed part of the continuum of contacts that had transpired between the parties.[15]

The Court therefore concludes that, by his repeated acts of fraud, active and passive misrepresentation, conversion and outright corporate looting for the purpose of defrauding and hindering the plaintiff creditors, King pierced his corporate veil and subjected himself to this Court's personal jurisdiction. In light of his ample contacts with this State,[16] it violates neither due process nor O.C.G.A. § 9–10–91 to exercise personal jurisdiction over him.

To that end, all of King's cases are easily distinguishable. In *Taeger Enterprises v. Herdlein Technologies,* 213 Ga.App. 740, 445 S.E.2d 848 (1994), for example, the act constituting conversion occurred in Illinois and caused injury in Florida, thus supporting the Georgia trial court's finding of no personal jurisdiction. *Id.* at 748, 445 S.E.2d 848. Here King converted plaintiffs' funds in New Jersey, thus unquestionably depriving (and legally injuring) plaintiffs in Georgia—the site of the lockbox, where Citi–Chem had obligated itself ultimately to perform (i.e., cause customers remittances to be sent to it) under the parties' product-supply agreement.

## B. King's Motion to Stay

In moving for a stay, King contends that (1) plaintiffs' claims against him belong to Citi–Chem's bankruptcy estate; (2) only the bankruptcy trustee has standing to litigate those claims; therefore (3) this case must be stayed against him until the trustee litigates or abandons those claims. CV496–192, doc. # 61. This argument raises some rather subtle bankruptcy law distinctions.

■ King correctly notes that both plaintiffs are creditors of Citi–Chem while it presently remains a debtor in bankruptcy. He also is correct in pointing out that if a claim (e.g., misappropriation of corporate assets) belongs to the debtor's estate, then only the trustee, and not an individual creditor, has standing to assert that claim during the pendency of a bankruptcy case. *See In re Foundation for New Era Philanthropy,* 201 B.R. 382, 391 (Bankr.E.D.Pa.1996) (citing *Matter of Educators Group Health Trust,* 25 F.3d 1281, 1283–84 (5th Cir.1994); *John L. Motley Associates, Inc. v. Rumbaugh,* 104 B.R. 683, 687–88 (E.D.Pa.1989)).

The rationale for this is contained in the " 'general bankruptcy policy of ensuring that all similarly-situated creditors are treated fairly' [thus] requir[ing] that the trustee have the first opportunity to pursue estate actions

**15.** The combined marketing and lockbox agreements between the parties—including defendant Citi–Chem—generated a heavy, routinized flow of written and telephonic contacts between Chemtall's Georgia facility and Citi–Chem's New Jersey office. Carlson Aff. ¶¶ 6, 8, 29. Carlson, Pearl River's Vice President since 1991, estimates that over 300 lockbox transactions flowed through the lockbox since its institution. *Id.* ¶¶ 11, 21.

**16.** Such contacts easily fall within the jurisdictional range established in this circuit. *See Complete Concepts, Ltd. v. General Handbag Corp.,* 880 F.2d 382, 388–89 (11th Cir.1989) (Florida corporation established the requisite minimum contacts with Georgia where it made a single, calculated visit to the State which resulted in a contract with a Georgia firm to manufacture and sell ladies' handbags); *Electronic Transaction Network v. Katz,* 734 F.Supp. 492, 499–501 (N.D.Ga.1989) (New York defendant had the required contacts with Georgia, where he contacted plaintiff, a Georgia corporation, the parties entered into an agreement after negotiations were conducted over the telephone, and defen-

dant made two trips to plaintiff's company, at which time they negotiated and modified commission rates); *Garrett Assoc., Inc. v. Mediplex Group, Inc.,* 209 Ga.App. 738, 739–40, 434 S.E.2d 568 (1993) (personal jurisdiction established over Massachusetts corporate defendant that initiated contact with Georgia plaintiff and induced plaintiff to perform services on defendant's behalf to plaintiff's financial detriment; defendant actively and purposely created continuing obligations between them); *see also Hall v. LaRonde,* 56 Cal.App.4th 1342, 66 Cal.Rptr.2d 399, 401–02 (Cal.App.2nd Dist.1997) (use of electronic mail over Internet and telephone by party in another State may establish sufficient minimum contacts with State to support personal jurisdiction); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1125–27 W.D.Pa (1997) (personal jurisdiction established even though defendant limited its contacts to providing, over the Internet, a news service subscribed to by residents within that State); *SF Hotel Co. v. Energy Investments, Inc.,* 985 F.Supp. 1032, 1034–36 (D.Kan.1997) (collecting cases showing growth of personal jurisdiction via active cyberspace contacts).

without interference from individual creditors." *Educators Group*, 25 F.3d at 1284 (quoting *Matter of S.I. Acquisition Inc.*, 817 F.2d 1142, 1153–54 (5th Cir.1987)).

■ But which claims belong to the estate? Underlying State law controls, and courts "look at the nature of the injury for which relief is sought." *Educators Group*, 25 F.3d at 1284. The *Educators Group* court drew this line: Where a creditor's complaint against a debtor's corporate principal alleges a direct injury to the plaintiff, such claim belongs solely to that plaintiff (in *Educators Group* this included fraud, and negligent misrepresentation of the debtor's financial status). *Id.* at 1284–86. However, where the claims directly impact the debtor corporation (e.g., negligent management, breach of a corporate officer's fiduciary duty to the corporation), and only indirectly impact the plaintiff creditors, then the claims belong exclusively to the debtor (typically the trustee). *Id.*

■ Here the fraud, conversion, and breach of contract claims belong to the plaintiffs, and not the trustee. Any doubt on that score should be resolved in favor of the plaintiffs, since Citi–Chem's bankruptcy trustee, having been placed on notice of plaintiffs' claims here (his counsel participated in deposing King), has simply not seen fit to intervene in this case. *Compare Educators Group*, 25 F.3d at 1283. Moreover, the Court's review of the N.J. bankruptcy court's adversary proceeding docket reveals that the trustee has already pursued King on related estate-based claims.[17] That pursuit resulted in an "Order dismissing Case Against Defendant Calvin King." *See Krell v. Citi–Chem, Inc. and Calvin M. King*, No. 97–1133–GMB, doc. # 32 (Bkrtcy.D.N.J.12/31/97) ("the above-captioned adversary proceeding is dismissed against defendant, Calvin King, without prejudice and without bar by the entire controversy doctrine, to the chapter 7 trustee bringing future claims against Calvin King").

■ The Court also notes that the plaintiffs have raised a viable constructive trust claim over the assets sought to be recovered here. *See Kelly v. Johnston*, 258 Ga. 660, 661, 373 S.E.2d 7 (1988) (a "constructive trust arises with respect to property the title to which was acquired by fraud, or where although acquired originally without fraud, it is against equity that the title should be retained by the one who holds it"); *Atlanta Classic Cars, Inc. v. Chih Hung USA Auto. Corp.*, 209 Ga.App. 908, 910, 439 S.E.2d 498 (1993). Normally, such funds never become part of the bankruptcy estate in the first place. *See First Bulloch Bank & Trust Co. v. Inca Materials, Inc.*, 880 F.2d 1307, 1311 (11th Cir.1989) (constructive trust impressed upon a joint payment to a debtor/sub-subcontractor and its supplier such that the payment did not become part of the Chapter 11 estate). Accordingly, King's stay motion must be denied.

### C. King's Motion For Summary Judgment

In CV496–218, King moves for summary judgment against Chemtall on the grounds that he was acting only in his corporate capacity and as an agent for a disclosed principal. *See* doc. 46–48. King filed this motion prior to the plaintiffs' adduction of the Cobb, Stackhouse and Miller evidence against him. As set forth in the extensive factual recitation and personal jurisdiction analysis *supra*, ample evidence exists to support plaintiffs' showing that King, under alter ego, corporate veil-piercing liability theories, can be held personally liable on both plaintiffs' tort as well as their contract-based claims. In that, at a minimum, a question of fact exists, King's motion must be denied.

### D. King's Motion to Preclude Stackhouse and Cobb Testimony

■ As mentioned above, Stackhouse and Cobb, former Citi–Chem employees who have since testified *against* the defendants,

---

17. *See* CV496–192, doc. # 64, exh. A. (copy of 4/29/97 Trustee's Adversary Proceeding Complaint to extend bankruptcy proceedings from Citi–Chem to CCI–DC and to recover "compensation to [Citi–Chem's] estate for fraudulent transfer of property"); *id.* at 4 (demanding

"judgment against Calvin King for a sum sufficient to compensate [Citi–Chem's bankruptcy] Estate for ... losses [arising from 11 U.S.C. § 548, pre- and post-petition transfers and State common law fraud]").

initially invoked their Fifth Amendment privilege in response to plaintiffs' deposition subpoenas. *See* 5/22/97 Cobb/Stackhouse Dep. at 27–28, 58. Citing precedent holding that a litigant cannot selectively invoke and then waive the privilege to her own benefit, King now moves to preclude consideration of the post-Fifth Amendment Stackhouse and Cobb testimony. CV496–218, doc. # 66.

This motion is without merit. It is true that, "once a witness testifies, she may not invoke the fifth amendment privilege so as to shield that testimony from scrutiny. To allow her [or him] to do so would constitute a positive invitation to mutilate the truth." *U.S. v. Two Parcels Property Located at 2730 Highway 31, Jemison, Chilton County, Ala.*, 909 F.Supp. 1450, 1456 (M.D.Ala.1995) (internal cites and quotes omitted; brackets original). In such cases the witness is selectively invoking the Fifth Amendment to his or her litigational benefit.

But it is also true that King's former employees did not testify first, then invoke the Fifth Amendment; instead, they did the opposite. More importantly, they testified against *him*, and thus did not selectively invoke the privilege to *their* litigational benefit. This motion likewise must be denied.

### E. Plaintiffs' Motions to Strike

#### (1) "The Parade of Horribles"

As mentioned above, both plaintiffs move to strike King's Answer based on perjury and discovery-sanction grounds. CV496–192, doc. # 58–59, 74; CV496–218, doc. # 35, 75, 77. They point to a variety of King's misdeeds:

(a) King lied under oath about his "dummy invoice" scheme. *See* CV496–218, doc. # 36 at 4–9, *see also* doc. # 75 at 3–5 (summarizing former Citi–Chem employee testimony contradicting King's).

(b) Through Talty's misleading letter, King lied and tried to conceal that scheme during pre-suit negotiations. *See* CV496–218, doc. # 36 at 4–5.

(c) King directed the reactivation and misuse of CCI–DC in order to siphon off Citi–Chem's incoming, "lockbox-bound" revenues and accounts, then funneled Citi-

Chem's money into a new bank account to hinder and avoid the plaintiff creditors and convert their funds; and, he subsequently lied under oath about critical details in order to conceal his misdeeds. *See* CV496–218, doc. # 36 at 9–13.

(d) Because King lied under oath about CCI–DC and its continuation of Citi–Chem's business in order to further hinder plaintiffs, they were forced to bear the unnecessary expense of obtaining the truth from third parties (i.e., Citi–Chem customers, banks, twice deposing Stackhouse and Cobb, obtaining affidavits from Miller and Stackhouse, etc.). *See* CV496–218, doc. # 36 at 9–12.

(e) King violated State court injunction orders (at least during the intervening few weeks between their 8/15/96–8/22/96 issuance and Citi–Chem's 9/9/96 bankruptcy). *See* CV496–218, doc. # 36 at 17–20.

(f) Even after plaintiffs' initial round of strike motions, in which they illuminated King's contradictory testimony, he failed to file "any affidavit or other evidence in the record which explains his previous testimony, or in any way defends against the accusations of perjury." CV496–218, doc. # 75 at 5–6.

(g) Even after this Court (by Order and subpoena) ordered him to do so, King presented misleading documents at his 1/29/97 deposition (i.e., he turned over a different set of invoices than those that he actually sent to his customers)—all as part of his continuing effort to conceal the "dummy invoice" fraud that he perpetrated against the plaintiffs. *See* CV496–218, doc. # 75 at 7–9.

(h) King also lied under oath about his personal receipt of funds (in the form of a "loan") from Citi–Chem. *See* CV496–218, doc. # 75 at 9–10.

(i) King paid himself a $75,000 "consulting fee" from Citi–Chem while it was bankrupt, but that fact was covered up in King's initial production of the company's check register. *See* CV496–218, doc. # 75 at 10–11.

(j) In addition to exploiting the bankruptcy stay, CV496–218, doc. # 36 at 15–16,

*see, e.g.,* 10/2/96 King Dep. at 5, 20–21, 157–62, King blocked discovery to the point of triggering sanctions,[18] all as part of his overall effort to hinder plaintiffs' recovery, CV496–218, doc. # 36 at 14–15; he had to be deposed three times, and even at that he constantly delayed his deposition reschedulings to buy himself more time so he could pay himself over $100,000 in "consulting fees" from CCI–DC (derived from diverted, Citi–Chem customer revenues). CV496–218, doc. # 36 at 16–17.

In short, plaintiffs wish to unsheath the "Samurai Sword." *See Malautea v. Suzuki Motor Corp.,* 148 F.R.D. 362 (S.D.Ga.1991), *aff'd, Malautea v. Suzuki Motor Co. Ltd.,* 987 F.2d 1536, 1544 (11th Cir.) (default sanction may be proper for violation of discovery orders even when not preceded by lesser sanctions, where lesser sanctions would not be effective; such default may be entered irrespective of the probable merits of the sanctioned party's case); *see also id.* at 1545–46 (district court has inherent power to sanction party or attorney who shows bad faith by hampering enforcement of court order, though such power must be exercised with restraint and discretion), *cert. denied,* 510 U.S. 863, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993).

Among the points raised above, plaintiffs specially illuminate King's violation of the State court orders. They do so while referencing their constructive trust claim because, like their conversion claim, *see supra* note 12, it requires that funds be traced. Plaintiffs urge the Court to view King's false testimony in that light, especially as to (a) whether any entity with which he was connected was involved in the business of selling water polymer products; and (b) the location of any CCI–DC bank accounts. King lied under oath, plaintiffs contend, in no small part to

frustrate their constructive trust claim, since he obviously compounded tracing difficulties by commingling funds and assets between the two corporations he controls. CV496–218, doc. # 36 at 20.

Plaintiffs also seek to bring King's perjury under the F.R.Civ.P. 37 sanction-precedent umbrella (such cases typically involve demonstrated defiance of a court order).[19] To that end, they emphasize that there was no need for a formal court order commanding King to tell the truth because he was independently obligated (by force of his oath and the perjury statute) to do so. *Id.* at 20; *see* 18 U.S.C. § 1621(1) (applies to false statements, made under oath, to a tribunal); 18 U.S.C. § 1621(2) (applies to false statements, made in a written declaration that the author "subscribes as true" under penalty of perjury); *U.S. v. Holland,* 22 F.3d 1040, 1047 (11th Cir.1994) (perjury is not "less serious when made in a civil proceeding").

On these premises, plaintiffs contend that Rule 37(b)(2)(C), alternatively Rule 37(d), authorizes this Court to strike King's Answer. CV496–218, doc. # 36 at 21. They also point to this Court's inherent power, as recognized by *Malautea,* 987 F.2d at 1545. CV496–218, doc. # 36 at 22–23. In their supplemental motion (filed after further discovery uncovered even more of King's activities), plaintiffs illuminate King's persistent practice of contradicting his own testimony, "of telling only half- or non-truths, of attempting to delay the [p]laintiff[s]' legitimate discovery, and of producing inaccurate documents...." CV496–218, doc. # 75 at 12.

King has failed to respond to most of plaintiffs' factual allegations and legal contentions. Indeed, in *Pearl River,* the Magistrate Judge had to order him to respond. *See* CV496–192, doc. # 70 (order advising

---

**18.** *See* Pearl River's Motion To Compel, CV496–192, doc. 20–21, addressed by the Magistrate Judge's Order, doc. # 25 (granting it and ordering F.R.Civ.P. 37 fees and expenses against King); *see also* doc. # 26 (plaintiff's Submission of Fees and Expenses), opposed in doc. # 30–31, and addressed in doc. # 38; Pearl River's 12/13/96 Motion to Compel/Strike Answer, CV496–192, doc. # 28, opposed by King, doc. # 34, *see also* doc. # 35, addressed by a 2/4/97 Order (doc. 39) granting plaintiff's expenses for

bringing the motion; doc. 46 (granting expenses claim); doc. 50 (enforcement Order); doc. # 59 at 17–18.

**19.** Absent other misconduct, a defendant must have willfully defied a discovery order to justify a default sanction under Rule 37. *See U.S. v. Certain Real Property Located at Route 1,* 126 F.3d 1314, 1317–18 (11th Cir.1997); *see also Chudasama,* 123 F.3d at 1371.

King to respond to Pearl River's Motion to Strike or it would be granted). Even at that, King's largely superficial, 10/6/97 response (CV496–192, doc. # 71) consists of little more than a reprint of his 5/23/97 *Chemtall* "Strike" response brief. And, he filed his 5/23/97 response *before* plaintiffs obtained the Cobb, Stackhouse and Miller depositions/affidavits implicating King in the assorted fraud and unethical conduct described above.[20] One would think that King would be inclined to use his 10/6/97 response brief to confront that testimony, or at least insist that such testimony was untrue, and thus disputed. Alas, he did not.

By failing to respond to, much less make any effort to rebut, the "post-Fifth Amendment" testimony against him, King therefore indicates no opposition to, and thus admits, the otherwise supported factual assertions set forth above. *See* Local Rule 7.5. The issue, then, is whether plaintiffs are entitled to have King's Answer stricken. Since King's due process and jury-trial rights are implicated here, pause must be taken to examine plaintiffs' motion under the proper evidentiary and discretion-governing standards—a point largely ignored by the parties' briefs.

### (2) Governing Standards

■ "In addition to the power to sanction under Rule 37, this [C]ourt has the inherent power to protect the integrity of the judicial system, and prevent abuses of the Judicial process. *Shepherd v. American Broadcasting Companies,* 62 F.3d 1469, 1474 (D.C.Cir. 1995)." *Webb v. Government for D.C.,* 175 F.R.D. 128, 143 (D.D.C.1997). Generally, " 'a district court may use its inherent power to enter a default judgment only if it finds, first, by clear and convincing evidence—a preponderance is not sufficient—that the abusive behavior occurred; and second, that a lesser sanction would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits.' " *Richardson v. Union Oil Co. of California,* 167 F.R.D. 1, 4 (D.D.C.1996), *modified in part,* 170 F.R.D. 333, 334–35 (D.D.C.1996) (quoting *Shepherd* 62 F.3d at 1472–73).

■ The case law reveals a variety of fact and circumstance-sensitive contexts in which the "ultimate" sanction has been employed. A court may impose the default sanction, for example, "where the guilty party has engaged in such wholesale destruction of primary evidence regarding a number of issues that the district court cannot fashion an effective issue-related sanction. . . ." *Shepherd,* 62 F.3d at 1479. In *Shearson Loeb Rhoades, Inc. v. Quinard,* 751 F.2d 1102, 1103 (9th Cir.1985), the court affirmed a default judgment entered against the defendant for "willful and deliberate disobedience of a discovery order, willful concealment of evidence, and attempted fabrication of false evidence."

While many default cases feature evidence destruction, alteration, or fabrication, *see McGuire v. Acufex Microsurgical, Inc.,* 175 F.R.D. 149, 154–57 (D.Mass.1997); *Webb,* 175 F.R.D. at 147–49, such misconduct often is encapsulated by perjury. *See TeleVideo Systems Inc. v. Heidenthal,* 826 F.2d 915, 917–18 (9th Cir.1987) (district court did not abuse its discretion in striking defendant's Answer and entering default judgment against him on the basis of his perjury during depositions and his filing of false pleadings, even though he recanted his perjury prior to trial, where he made it clear that his recantation was orchestrated to reap a tactical advantage); *cf. Boron v. West Texas Exports, Inc.,* 680 F.Supp. 1532, 1536–37 (S.D.Fla.1988) (sanction of de-

---

**20.** Cobb and Stackhouse initially invoked the Fifth Amendment, then waived it, and in July, 1997 depositions, contradicted Kings' claims of ignorance and non-involvement in the customer remittance diversions. *See* CV496–192, doc. # 59 at 8–9; CV496–218 5/22/97 Cobb/Stackhouse Dep. at 34–35; CV496–218 7/14/97 Stackhouse Dep. at 17–18 (King directed her to re-label a Citi–Chem invoice so the customer's check would not go to the lockbox but instead would be mailed to Citi–Chem; she also verified King's direction to send the "unaltered" invoice copy to plaintiffs; *id.* at 23–27; *see also supra* note 4 (detailing Citi–Chem's "dummy" invoicing scheme); 7/14/97 Cobb Dep. at 5 (she was vice president of operations and management as of her January, 1997 departure date); *id.* at 6–11, 16–17, 18–19, 49–52 (she was aware of King's participation in the invoice re-labeling scheme and Citi–Chem's concealment of it from plaintiffs); *id.* at 17–18 (King instituted the scheme in 1996, after Chemtall threatened to stop shipping its products).

ciding personal jurisdiction issue against defendant was appropriate sanction for filing a false affidavit concerning jurisdictional facts), *aff'd,* 869 F.2d 1500 (11th Cir.1989).

The "ultimate sanction," of course, cuts both ways. *See Vargas v. Peltz,* 901 F.Supp. 1572, 1579–83 (S.D.Fla.1995) (dismissal of plaintiffs' sexual harassment case was warranted by persistent pattern of misconduct by plaintiff and her husband, which included fraud on the court, fabrication of evidence, perjury, and obstruction of discovery process), cited in *McDowell v. Seaboard Farms of Athens, Inc.,* 1996 WL 684140 at \*\* 1, 7–8 (M.D.Fla.11/14/96) (unpublished), which reached the same result where a sexual harassment plaintiff was caught "fabricating key evidence" and then lying about it. *See also id.* at \*\* 1–4 (collecting default/dismissal sanction cases); *Combs v. Rockwell Int'l Corp.,* 927 F.2d 486 (9th Cir.1991) (dismissal warranted; party authorized attorney to falsely alter his deposition transcript on material, key and substantive issues in the litigation); *Nichols v. Klein Tools, Inc.,* 949 F.2d 1047, 1049 (8th Cir.1991) (dismissal appropriate because plaintiff lied at depositions and in pleadings about his use of defendant's product; plaintiff "repeatedly concealed a material fact"); *Brady v. U.S.,* 877 F.Supp. 444, 454 (C.D.Ill.1994) (dismissing employment tax refund case with prejudice; plaintiff concealed true employment history, backdated and fabricated documents central to his claims, and committed perjury both in his deposition and at an evidentiary hearing); *In re Southeast. Banking Corp. Securities and Loan Loss Reserves Litigation,* 212 B.R. 397, 403–04 (S.D.Fla.1997).

"Ultimate sanction" cases ultimately rest upon the conviction that no lesser sanction will prevent the offending litigant from continuing to lie or distort the truth so pervasively that it "prevent[s] the opposing party from fairly presenting his case or defense." *Nichols,* 949 F.2d at 1048 (quotes and cite omitted); *Vargas,* 901 F.Supp. at 1579. Use of the "ultimate sanction" addresses not only prejudice suffered by the opposing litigants, but also vindicates the judicial system as a whole, for such misconduct threatens the very integrity of courts, which otherwise "cannot command respect if they cannot maintain a level playing field amongst participants." *Derzack v. County of Allegheny, Pa.,* 173 F.R.D. 400, 414 (W.D.Pa.1996).

Those who lie, evade and fail to tell the *whole* truth obviously enjoy an advantage over honest litigants. The victimized opponent winds up, as in this case, consuming substantial resources to respond to and "undo" the victimizer's lies and distortions. Here plaintiffs did just that by resorting to third party discovery, then confronting King with contradictory documents, and even his own testimonial contradictions. Rather than confront the Cobb, Miller and Stackhouse deposition/affidavit testimony showing that King defrauded plaintiffs and lied under oath (e.g., by submitting an additional affidavit denying the otherwise damning facts to which they testified), King simply moved, on technical grounds, to exclude their testimony, citing facially inapposite case law. His silence and ultimately futile litigational response speak volumes.[21] In the meantime,

---

21. In light of these facts, King's Georgia counsel is reminded of his duty to reasonably investigate the factual and legal grounds before filing further defensive pleadings. He cannot merely rely on what his client tells him. *See Childs v. State Farm Mutual Auto. Ins. Co.,* 29 F.3d 1018 (5th Cir.1994) (F.R.Civ.P. 11 sanctions imposed where client clearly lied and attorney made no independent investigation, after which he should have withdrawn from the case); *see also Jones v. Int'l Riding Helmets, Ld.,* 49 F.3d 692 (11th Cir. 1995) (Rule 11 sanctions were warranted by counsel's knowledge when he filed complaint that manufacturer was incorporated after helmet was manufactured, and thus could not have manufactured helmet; district court properly considered counsel's postfiling actions in determining whether sanctions were appropriate); *Worldwide Primates, Inc. v. McGreal,* 87 F.3d 1252 (11th Cir.1996).

While those cases relied on Rule 11 prior to its 1993 amendment, nevertheless the amendment did not alter counsel's ongoing, independent duty to investigate the legal and factual basis of his client's position when the facts and law place him on notice to do so. *See* Rule 11, 1993 Amendment Advisory Committee Notes, Subdivision (a). Nor did it affect 28 U.S.C. § 1927 or this Court's inherent power. *See id.* (Subdivision (d) notes); *cf. Association of American Physicians and Surgeons, Inc. v. Clinton,* 989 F.Supp. 8, 9, 11, 15–16 (D.D.C.1997) (condemning White House counsel for failing to supplement record

the Court itself is prevented from actually reaching the merits of the case—as well as resolving other cases—by having to stop and, as it has done here, exhaustively examine what is, at bottom, sanctionable perjury and fraud upon the Court.

Clear and convincing evidence in this case shows that King: (a) lied under oath during his depositions (even, at times resorting to childish responses, *see, e.g.,* 1/28/97 King Dep. at 186 (A. "Why did I *have* to inform them?") (emphasis added)); (b) sought to mislead plaintiffs in his deposition document production; (c) in bad faith stalled and misused the bankruptcy and discovery process by failing to disclose, then trying to hinder discovery of, CCI–DC and the intercorporate misappropriations detailed above; and (d) engaged in (a)–(c) in order to conceal the pre-litigation fraud and misrepresentations that he made for the express purpose of hindering plaintiffs' collection efforts. All that, in turn, facilitated King's plan to continue drawing substantial "consulting payments" to himself while draining Citi–Chem (and thus, plaintiffs' opportunity to recover through this litigation and/or the bankruptcy process). Given these circumstances, the Court finds that no lesser sanction than default will suffice here.

It is telling that King has not even attempted to deny that he lied and misled plaintiffs as to the deposition documents he produced. Instead, he resorts to arguing, for example, that one particular lie was "harmless" because plaintiffs discovered, through their participation in Citi–Chem's bankruptcy proceedings, documentation disproving his testimony. *See* CV496–192, doc. #71 at 5–6.[22] Besides, he reasons, plaintiffs can always use it to impeach him at trial. *Id.* at 6 ("The appropriate remedy under these circumstances is to submit [to the jury his] testimony and the relevant evidence ... and allow the jury to make its own decision as to the credibility of Mr. King"). So in other words, one is free to lie under oath so long as one's opponent can otherwise unearth the truth and later use it to score impeachment points at trial. Suffice it to say that King's arguments *reinforce* the Court's finding that "lesser sanctions will not adequately deter and punish [his] misconduct." *Shepherd,* 62 F.3d at 1484.

In that respect, King has advanced several other arguments, all without merit. For example, he responds to plaintiffs' Talty-letter misrepresentation charge *not* by denying that it was intended to mislead and hinder his creditors, but instead by invoking the settlement privilege, thus contending that the letter is "inadmissible" under F.R.Evid. 408. CV496–192, doc. #71 at 2–3; CV496–218, doc. #51 at 2–3. Alternatively, he argues, the Talty letter at worst authorizes a bad-faith attorney's fee sanction, not the default sanction. *Id.* at 3. Not surprisingly, King cites no precedent in support of either argument.

The Court has no difficulty holding that, where a party's overriding purpose in advancing a "settlement" communication is not to work a settlement, but instead an outright fraud, such misuse estops him from invoking the evidentiary privilege. *Cf., Dyer v. Investors Services, Inc.,* 200 Ga.App. 634, 636, 409 S.E.2d 249 (1991) (document reflecting proposed settlement between defendants was admissible because its overriding purpose was not to settle dispute with plaintiff, but to settle ongoing differences between defendants and to wind up affairs of their partnership). Just as a settlement communication shown to have obstructed a criminal investigation is admissible, *see U.S. v. Hays,* 872 F.2d 582, 588–89 (5th Cir.1989), so too is a lawyer's "settlement" letter aimed at obstructing a civil investigation of massive financial fraud.

The fact that Talty's misrepresentation sought to throw plaintiffs off King's (and

---

and thus correct an untrue sworn declaration made by the President's Senior Advisor); *id.* at 15–16 ("such dishonesty is sanctionable and was not good faith dealing with the court or plaintiff's counsel"). King's New Jersey counsel, in the meantime, should consult *U.S. v. Webster,* 125 F.3d 1024 (7th Cir.1997).

**22.** Since King's "sanctions" response briefs are, in substance, the same in both cases, only CV496–192, doc. 71 (filed 10/6/97) shall be cited hereafter.

Citi–Chem's) trail also authorizes its analogization to an admission of debt, since the letter clearly sought to hinder the collection of Citi–Chem's debt. *See Turner v. Europe Craft Imports Inc.,* 186 Ga.App. 286, 289, 367 S.E.2d 99 (1988) (attorney's offer to settle advertiser's liability with TV station was admissible as admission of debt under O.C.G.A. § 24–3–37). Finally, King is correct in pointing out that bad-faith attorney fees are available in diversity cases. *See* O.C.G.A. § 13–6–11. But the availability of that remedy does not preclude the imposition of another, especially where, as here, an unbroken pattern of commercial and litigational fraud has been exposed.

King next complains that plaintiffs' counsel failed to meet and attempt to resolve their "discovery differences" before moving for a default sanction. CV496–192, doc. # 71 at 3–4. Where, as here, utter futility has been demonstrated, the requirement is dispensable. *Cf. Fisher v. Board of Commissioners of Douglas County,* 200 Ga.App. 353, 354, 408 S.E.2d 120 (1991) (duty to confer requirement need not be met where opponent has simply failed to respond).

As for blocking discovery, King seems to be arguing that he was "entitled to object," but he never challenges plaintiffs' showing that his repeated objections were constantly overruled, and that they came as part of an overall pattern and practice of obstructing plaintiffs efforts with ultimately unsuccessful, often sanction-inducing litigation maneuvers, *see supra* note 18. CV496–192, doc. # 71 at 6–7. More importantly, he simply does not (nor can he) deny that he has been repeatedly sanctioned by this Court. The Court likewise cites to this argument in support of its "no lesser sanction" finding above.

Finally, King justifies his violation of the State court injunctions because, he contends, there was no personal jurisdiction over him, so he was not obligated to obey same. *Id.* at 7–8 (citing *In re Novak,* 932 F.2d 1397 (11th Cir.1991)). As the analysis set forth in Part II(A) above shows, personal jurisdiction did exist over him. And, while this *Court* may have been authorized to dissolve or modify the State court orders, *see* Ann., *Status, in federal court, of judgment or order rendered by state court before removal of case,* 2 A.L.R.Fed. 760; 28 U.S.C. § 1450, *King* was not authorized to disregard them. *See Demoss v. Kelly Services, Inc.,* 355 F.Supp. 1111, 1113 (D.P.R.1972) (TRO from removed court remains in full force and effect until dissolved or modified by federal court), *aff'd,* 493 F.2d 1012 (1st Cir.1974); *Galper v. U.S. Shoe Corp.,* 815 F.Supp. 1037, 1043 (E.D.Mich.1993).

It is true, as King points out, that parties are free to disregard a court order issued by a court without jurisdiction. *See Novak,* 932 F.2d at 1401–02. But King, who employed the service of counsel at the time, knew or should have known that (a) he and Citi–Chem by that point had enjoyed substantial continuous contacts with Georgia; and (b) he faced a substantial probability that the issuing court would find personal jurisdiction over him and Citi–Chem. By sending out a defiance letter to Citi–Chem's customers, and failing to have Citi–Chem remit the moneys as ordered, King willfully disregarded a lawful court order so he could ultimately reap a bigger pot of customer-revenue money for his own use (e.g., for his "consulting fees" and to continue Citi–Chem's operations under CCI–DC). King thus demonstrated (as he has since) at best a contemptuous defiance of the judicial process. This, too, supports the Court's finding that nothing less than the default sanction is warranted here. Accordingly, plaintiffs' strike motions will be granted under both the Court's inherent power and Rules 11, 26(g)(3), and 37.

### F. Chemtall's Motion For an Order of Contempt

Chemtall also moves for an Order holding King and defendants' counsel, Dennis Talty, in contempt for violating the above-referenced State court orders. CV496–218, doc. 34. Assuming *arguendo* that the motion should be granted, at most the Court would consider entering a default judgment against King. To that extent, this motion will be denied as moot. Talty correctly contends (*see* CV496–218, doc. # 49) that he has made no appearance in this case; nor have plaintiffs shown the Court any basis for exercising personal jurisdiction over him. Hence, the

motion must be denied on these additional grounds.

### G. Chemtall's Motion In Limine

In its Motion In Limine, Chemtall seeks to bar King from arguing, at trial, that Chemtall " 'ran him out of business,' and that his acts were justified in light of [Chemtall's] conduct...." CV496–218, doc. # 55 at 2. In light of the sanctions ruling above, this motion also will be denied as moot.

### H. "Default" Damages

Entry of default against King does not end the case. "Once the court determines that a judgment by default should be entered, it will determine the amount and character of the recovery that should be awarded." 10 Charles A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRAC. & PROC. CIVIL 2d § 2688 (1997 Supp.); *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990) (default conclusively establishes liability, not damages). Damages are most easily awarded, without a hearing, if they are for a liquidated amount—a "sum certain." 10 FEDERAL PRAC. & PROC. CIVIL 2d § 2683 at 414; *see also Walker v. Hambrick*, 226 Ga. App. 207, 208, 486 S.E.2d 77 (1997) (Upon Hambrick's default for failing to Answer Walker's Complaint in a conversion action, trial court erred by failing to grant default judgment for Walker; since Walker presented affirmative evidence that Hambrick converted $60,000 and there was no evidence Hambrick denied the conversion, the trial court also should have awarded Walker $60,000 as a liquidated damages amount).

■ However, a plaintiff "cannot satisfy the certainty amount simply by requesting a specific amount. He must also establish that the amount is reasonable under the circumstances." 10 FEDERAL PRAC. & PROC. CIVIL 2d § 2688 at 415; § 2684 at 418. Furthermore, items like "reasonable attorney's fees" are simply not a "sum certain." *See Combs v. Coal & Mineral Mgmt. Serv., Inc.*, 105 F.R.D. 472, 475 (D.D.C.1984).

■ Nevertheless, both liquidated and unliquidated default damages may be proved by affidavits. *See Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53–54 (2d Cir.1993); *see also Fustok v. ContiCommodity Serv., Inc.*, 873 F.2d 38, 40 (2d Cir.1989) ("While it is true ... that the damages in this case were neither liquidated nor capable of mathematical calculation, it was not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in a default judgment").[23] Of course, the Court may hold a hearing if it is unable to compute damages from the affidavits alone. Otherwise, King is not entitled to a hearing, much less a jury trial, on damages. *See Adriana*, 913 F.2d at 1414 (corporation against whom default judgment was entered as discovery sanction had no right to a jury trial on damages); *Clarke v. Whitney*, 975 F.Supp. 754, 755 n. 1 (E.D.Pa.1997).

Given the age of this case, the judicial resources it has consumed, and the overarching issue of judgment collectibility, plaintiffs may, if they so choose, waive their unliquidated claims, *see, e.g.,* CV496–218, doc. # 1, (Complaint) at 4; doc. 54 (Amended Complaint) at 9 ¶ IV(b)–(d) (punitive damages, attorney's fees and costs); CV496–192, doc. # 1 (Complaint) at 6; doc. # 66 (Amended Complaint) at 6–7 ¶ IV(b)–(d) (punitive damages, attorney's fees and costs),[24] and instead

---

**23.** As for punitive damages, *see James v. Frame*, 6 F.3d 307, 309–11 (5th Cir.1993) (evidentiary hearing was not required before entering punitive damages award in fraud suit by group of investors where district court was familiar with defendant's conduct by virtue of litigation which has been pending before court for over seven years); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 509 (2nd Cir.1991) (a district court is not required to hold a full evidentiary hearing prior to awarding punitive damages to plaintiffs in a breach of contract action where the defendant has indicated it will not appear and voluminous record evidence exists); *see also Wal–Mart*

*Stores, Inc. v. Forkner*, 221 Ga.App. 209, 471 S.E.2d 30 (1996) (awarding punitive damages in default following an evidentiary hearing).

**24.** This is not to suggest that attorney fees cannot be reduced to a liquidated claim. *See James*, 6 F.3d at 311 (no reversible error in failing to hold default damages hearing on attorney fee claim; it was liquidated since "the record show[ed] that detailed billing records substantiated [it] ...."); *see also Hudspeth*, 230 Ga.App. at 71–72, 495 S.E.2d 322 (proving attorney's fees under O.C.G.A. § 13-6-11); *Mitcham*, 214 Ga.App. at 31–32, 447 S.E.2d 83.

move for expeditious entry of a F.R.Civ.P. 54 Final Judgment against King on their liquidated claims, *see* CV496–218, doc. # 54 at 9 ¶ IV(a) ("$1,162,625.99, plus prejudgment interest"); CV496–192, doc. # 66 at 6 ¶ IV(a) ("$1,259,854.05, plus prejudgment interest"). Either way, their moving papers, and any affidavits, should supply the reasonable basis for, and prejudgment calculation on, any "sum certain" they now seek.

Short of that, the Court will entertain fully supported default damages motions (i.e., with all necessary affidavits and computations) within 10 days of the date of this Order (King shall have 10 days within which to respond) and, if necessary, schedule an immediate evidentiary hearing to receive any additional evidence needed to enable computation.

## III. *CONCLUSION*

### A. In CV496–218:

The motion (doc. # 29) of plaintiff Chemtall, Incorporated ("Chemtall") to consolidate this case with *Pearl River Polymers Inc. v. Citi–Chem, Inc. and Calvin King*, CV 496–192 is *GRANTED.* Defendant Calvin M. King's motions to Dismiss (doc. # 6), to Stay (doc. # 43), for Summary Judgment (doc. # 46), and to Preclude Testimony (doc. # 66) are each *DENIED.* Chemtall's Motion To Strike Answer (doc. # 35) is *GRANTED,* but its Motion For Contempt (doc. # 34) is *DENIED* as moot, as is its Motion In Limine (doc. # 55).

The parties shall comply with the briefing schedule set forth *supra* in Part II(H). Following entry of a Rule 54(b) final judgment against King, the remainder of this action (i.e., against defendant Citi–Chem, Inc.) shall remain stayed pending the resolution of its bankruptcy proceedings, but nevertheless closed for administrative purposes.

### B. In CV496–192:

The motion (doc. # 51) of plaintiff Pearl River Polymers, Inc. ("Pearl River") to consolidate CV496–192 with *Chemtall, Incorporated v. Citi–Chem, Inc. and Calvin M. King*, CV 496–218, is *GRANTED.* King's Motion to Stay (doc. # 60) is *DENIED;* as is his Motion to Dismiss (doc. # 36) plaintiff Pearl River's Complaint. Pearl River's Motion To Strike Answer (doc. # 58) is *GRANTED.*

As in CV496–218, the parties shall comply with the briefing schedule set forth *supra* in Part II(H). Following entry of a Rule 54(b) final judgment against King, the remainder of this action (i.e., against defendant Citi–Chem, Inc.) shall remain stayed pending the resolution of its bankruptcy proceedings, but nevertheless closed for administrative purposes.

**SO ORDERED,** this 27th day of January, 1998.