David R. RILEY, Plaintiff,

v.

SNECMA, INC., et al., Defendants.

No. C–3–96–18.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 20, 1999.

Irl Rasoner, III, for Plaintiff.

Scott King, William Schaller, Martin Castro, Thomas Noland, Dayton, OH, for Defendants.

**DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTION TO ENFORCE SETTLEMENT AGREEMENT AND TO DISMISS ACTION WITH PREJUDICE (DOC. # 44); PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT (DOC. # 47) SUSTAINED; SECOND AMENDED COMPLAINT TO BE FILED WITHIN FOURTEEN (14) DAYS; CONFERENCE CALL SET**

RICE, Chief Judge.

This litigation stems from the Plaintiff's former employment relationship with SPECO Corporation ("SPECO") and its affiliated and/or parent corporations, SNECMA, SNECMA, Inc., and LBG Company ("LBG"). Plaintiff David Riley served as the President and Chief Operating Officer of SPECO from March, 1994, through October, 1995, when he resigned from his position. Thereafter, on December 22, 1995, SPECO filed for Chapter 11 bankruptcy protection. Five days later, Riley initiated the present litigation in state court, naming as Defendants SNECMA, SNECMA, Inc., LBG, Jacques Bouhelier, and Eric Bachelet. The latter two Defendants are allegedly "agents, officers, and/or employee[s]" of SNECMA, SNECMA, Inc., and LBG. (Plaintiff's First Amended Complaint, Doc. # 14 at ¶¶ 5–6). Riley's state-court Complaint included four causes of action: (1) breach of express contract; (2) breach of implied and/or verbal contract; (3) intentional interference with contract; and (4) fraud.

The Defendants removed the action to this Court on January 24, 1996, on the basis of diversity of citizenship and the existence of a foreign sovereign as a party.[1] (Doc. # 1). Riley subsequently filed

---

1. Although the existence of complete diversity is not apparent from the face of the removed Complaint, the Court notes that removal predicated upon SNECMA's status as a for-

eign sovereign was appropriate. In their Notice of Removal (Doc. # 1), the Defendants state that SNECMA's stock is owned by the

an amended Complaint, adding a claim for promissory estoppel against the Defendants. (Doc. # 14). Thereafter, at the suggestion of SPECO, the Court stayed the present litigation on August 14, 1996, pending the resolution of an adversary proceeding in the bankruptcy court. (Doc. # 25). That proceeding, which involved a dispute between SPECO and Riley, was settled in January, 1998. Following Riley's settlement with SPECO, the Court lifted the bankruptcy stay on September 16, 1998. (Doc. # 41, Notation Entry, nunc pro tunc).

On October 23, 1998, the Defendants filed a Motion to Enforce Settlement Agreement and to Dismiss Action with Prejudice (Doc. # 44). In their Motion, the Defendants contend that Riley's present lawsuit should be dismissed for two reasons: (1) his five causes of action are the exclusive property of SPECO's bankruptcy estate; and (2) the five causes of action were settled by Riley as part of the adversary proceeding release that he negotiated with SPECO. In response to the Defendants' Motion to Dismiss, Riley has filed a Motion for Leave to File a Second Amended Complaint (Doc. # 47).[2] The proposed amendments eliminate Riley's breach of express contract claim and omit Bouhelier and Bachelet as Defendants. According to Riley, his second amended Complaint also "clarifies the existing causes of action against the remaining Defendants and demonstrates that such causes of action are not derivative in nature." (Id. at 1).

As a means of analysis, the Court will first address the Defendants' Motion to Dismiss in the context of Riley's amended Complaint (Doc. # 14). The Court then will consider what effect, if any, Riley's proposed second amended Complaint has on the Court's analysis, and whether leave to file said Complaint should be granted.

## I. Defendants' Motion to Enforce Settlement Agreement and to Dismiss Action with Prejudice (Doc. # 44)

In their Motion, the Defendants first argue that "Riley's claims belong exclusively to and have been settled by SPECO." (Id. at 11). In support, the Defendants note that, during the bankruptcy proceedings, SPECO entered into a Settlement Agreement and Release with Defendant LBG and the Pension Benefit Guarantee Corporation. As part of that agreement, SPECO agreed to:

hereby release[ ] and forever discharge[ ] all of its claims of any kind and nature that the [SPECO bankruptcy] estate may have or claim to have against LBG, each Affiliate and/or any other present or former officers, directors, employees or agents, other than David Riley, of SPECO or LBG, or any Affiliate.

(Doc. # 44 at Exh. A, p. 4, ¶ 8). In compliance with the terms of the foregoing Settlement Agreement, SPECO issued a General Release in favor of LBG, each of its Affiliates, and its (and their) officers, directors, employees, and agents. The General Release provides, in relevant part:

. . . SPECO, for itself, its successors and assigns, does hereby release and forever discharge LBG and each of its affiliates, together with each officer, director, employee, or agent currently employed by LBG or such Affiliate, or which has been employed by LBG or such Affiliate since December 22, 1995, save and except for David Riley (the "Released Group"), from any and all claims of any kind or nature, whether known or unknown, which SPECO may have or claim to have against any one or more of the Released Group.

SPECO further represents that this release is given to the Released Group

French government, thus qualifying the company as a "foreign state" under 28 U.S.C. § 1603. Accordingly, this action was properly removed, pursuant to 28 U.S.C. § 1441(d), which authorizes a foreign state to remove a state-court lawsuit against it. See In re Delta

America Re Ins. Co., 900 F.2d 890, 891 (6th Cir.1990).

2. A copy of the proposed second amended Complaint is attached to Riley's Motion.

with the understanding that it covers all actions, causes of action, claims, demands for, upon, or by reason of any damages, loss, or injury, which may be traced either directly or indirectly to any occurrence or condition originating prior to the date of this document, no matter how remotely they may be related to the occurrences prior to the date of this document that SPECO has or may have involving the Released Group. (*Id.* at Exh. B). The General Release defines "Affiliates" of LBG to include SNECMA and SNECMA, Inc. (*Id.*) Furthermore, Riley has acknowledged that Defendants Bouhelier and Bachelet are officers, directors, employees or agents of SNECMA, SNECMA, Inc., and/or LBG. (Complaint, Doc. # 14, at ¶¶ 5–6). As a result, the Court finds persuasive the Defendants' argument that SPECO has released them from any and all claims that *it* may have possessed against them.

The critical issue, then, is whether the various claims advanced by Riley in the present case actually are held by (i.e., "belong to") SPECO and its bankruptcy estate. If so, only SPECO has the ability to assert such claims, and it expressly waived that ability when it negotiated the release documents. On the other hand, if the causes of action in Riley's Complaint are his property, and not the property of SPECO, then the company's agreement to release its claims against the Defendants will not affect the viability of this litigation.

In *In re Van Dresser Corp.*, 128 F.3d 945 (6th Cir.1997), the Sixth Circuit addressed the issue now before the Court. In that case, the plaintiff-appellant, Daniel M. Honigman, was a shareholder and creditor of Van Dresser Corporation, a bankrupt debtor. Honigman filed a complaint against Comerica Bank, Wilma Brown, the bank's assistant branch manager, and another individual, Grant Friley, who managed one of Van Dresser's subsidiaries. In his Complaint, Honigman alleged that the Defendants had siphoned $2.7 million from Van Dresser's two subsidiaries, forcing it and the subsidiaries to declare bank-

ruptcy and to default on loans for which Honigman was the guarantor or co-signer. Upon review, the Sixth Circuit rejected Honigman's argument that he could recover against Comerica, Brown, and Friley for conversion, breach of fiduciary duty, civil conspiracy, negligent supervision of an employee, and aiding and abetting these tortious actions. In so doing, the court recognized that Renaissance and Westland, the two subsidiaries, already had recovered a portion of the lost $2.7 million from Comerica. The court then reasoned that Honigman's various causes of action actually were held by Van Dresser, and that he lacked the ability to pursue such claims personally.

In reaching this conclusion, the court recognized that Van Dresser's bankruptcy estate included "all legal or equitable interests of the debtor in property" at the time of the bankruptcy. *Id.* at 947. The court also noted that Van Dresser's "interests" in property included "causes of action." The *Van Dresser* court recognized, however, that if " 'a cause of action belongs *solely* to the estate's creditors, then the trustee has no standing to bring the cause of action.' " *Id.*, quoting *In re Educators Group Health Trust*, 25 F.3d 1281, 1284 (5th Cir.1994).

With the foregoing principles in mind, the court found that Van Dresser itself could have pursued each of Honigman's causes of action against the defendants. Consequently, the court determined that the various claims belonged to Van Dresser, not Honigman. In reaching this conclusion, the court established the following guidelines for determining when a cause of action constitutes the property of a debtor:

... [I]f the debtor could have raised a state claim at the commencement of the bankruptcy case, then that claim is the exclusive property of the bankruptcy estate and cannot be asserted by a creditor. *In re Educators Group Health Trust*, 25 F.3d at 1284. "Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor,

then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." *Id.* Thus, if Honigman's state claims could have been brought by Van Dresser or its subsidiaries on July 11, 1991, [the date of the bankruptcy filing] then the plaintiff is barred from pursing them now.

*Id.* at 947.

█ Because Van Dresser could have maintained a suit against the defendants at the time of its bankruptcy, based upon the causes of action alleged in Honigman's complaint, the Sixth Circuit determined that those claims were the exclusive property of Van Dresser.[3] In setting forth its analysis, the *Van Dresser* court cited favorably to *In re Educators Group Health Trust*, 25 F.3d at 1284. The Fifth Circuit's reasoning in *Educators Group* further illuminates the circumstances under which a claim is the exclusive property of a debtor's estate:

Whether a particular state cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case. [citation omitted]. As part of this inquiry, we look at the nature of the injury for which relief is sought. [citation omitted]. If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate. [citations omitted]. Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate.

*Id.* at 1285.[4]

As *Van Dresser* and *Educators ·Group* demonstrate, Riley's claims in the present

3. Although, under Michigan law, both Honigman and Van Dresser had suffered a legal injury, the court found Honigman barred from recovering on his claims, because Van Dresser had already done so. In this regard, Sixth Circuit reasoned:

The plaintiff has cited no case for the proposition that a corporation and its shareholder can both recover fully for a single tortious action, and we conclude that none exists. The absence of case law on this point is not surprising, in light of the fact that the result for which Honigman argues cannot logically be sustained. The defendants here took a finite amount of money from Renaissance and Westland. Although they may be liable for additional sums such as attorney fees, costs, and even treble damages, they cannot be required to repay the principal amount of $2.7 million more than once. If a thief steals a diamond necklace from a married couple, the husband cannot recover the value of the converted necklace from the thief after the wife has already recovered the necklace itself.

Stated differently, if Honigman had slipped and fallen on a negligently maintained floor at Comerica's offices, he could recover irrespective of his status as Van Dresser shareholder. However, the estate's recovery here against Comerica makes

Honigman whole in terms of the loss caused by Comerica....
*Id.* at 948.

4. Applying the legal standards set forth above, the *Educators Group* court determined that some of the plaintiffs' claims were the property of the debtor's estate, whereas other claims alleged a direct (as opposed to a derivative) injury to the plaintiffs and, therefore, were not the property of the estate. In relevant part, the court reasoned:

"The plaintiff school districts first argue that the causes of action are not property of the estate because the claims do not allege that the debtor suffered any injury or harm. We disagree with this broad assertion. Several of the causes of action allege a direct injury to the debtor, from which an injury to the plaintiff school districts is derived. For example, the plaintiff school districts allege in paragraph XIII of the complaint that the defendants negligently managed EGHT, causing EGHT to become insolvent and thus unable to pay the claims of employees of the plaintiff school districts. To the extent that this cause of action and others allege only a derivative harm to the plaintiff school districts, they belong exclusively to the estate.

We do agree, however, with the plaintiff school districts' contention that some of the causes of action allege a direct injury to

case are held by SPECO if it could have pursued such claims at the time of its bankruptcy. Even if Riley suffered some derivative injury as a result of the Defendants' actions, he cannot obtain a judgment on the claims if they caused a direct injury to SPECO, thereby giving it the exclusive ability to recover for the Defendants' allegedly tortious conduct.

Before undertaking an analysis of the claims set forth in Riley's first amended Complaint, the Court notes that he has withdrawn his breach of express contract claim against the Defendants (Count I), conceding that it is derivative in nature. (Doc. # 48 at 1). Therefore, the Court's analysis will address only Counts II, III, IV, and V, which allege breach of implied/oral contract, intentional interference with contractual relations, fraud, and promissory estoppel.

■ Based upon a review of those causes of action, the Court concludes that SPECO *could not* have pursued them in a lawsuit against the Defendants. In Count II of his first amended Complaint, Riley alleges that the Defendants made certain "representations, inducements, and agreements," which gave rise to an implied or oral contract with him. (First Amended Complaint, Doc. # 14 at ¶ 21). Although Count II provides few details about the nature of the Defendants' "representations, inducements, and agreements," the factual basis for Riley's claim is recited elsewhere in his Complaint. In particular, he alleges that, throughout the course of his employment with SPECO, the Defendants interfered with his job performance. As a result of that interference, Riley threatened to resign from his Chief Oper-

ating Officer position with SPECO. In response to his threats, he alleges that the Defendants:

offered a verbal agreement to Plaintiff in order to induce him to remain employed and not to exercise the termination provisions of the [SPECO] Employment Agreement. Plaintiff accepted this agreement and, in consideration thereof, remained in his position. Pursuant to his agreement, Defendants would terminate and cease all interference with Plaintiff's rights and duties as President and Chief Operating Officer of SPECO. Further, Defendants would permit Plaintiff to perform without interference and obstruction. Moreover, Plaintiff was to be made the President, Chief Executive Officer and Chairman of the Board of Directors of SPECO. Further, as Chairman of the Board of Directors, Plaintiff would report only to the executive management level of SNECMA. Defendants failed to comply with their representations and agreement because, among other things, Defendants['] interference and obstruction with Plaintiff's rights and obligations increased immediately following this agreement.

(Doc. # 14 at ¶ 14).

In short, Riley contends that the Defendants *promised him* that they would stop interfering with his job performance at SPECO, in exchange for his promise to remain employed by SPECO. Riley also has insisted, for some time, that this oral or implied promise by the Defendants constituted an agreement which was separate and distinct from his actual employment

themselves, which is not derivative of any harm to the debtor. For example, the plaintiff school districts allege in paragraph XI of the complaint that the defendants intentionally misrepresented *to them* the financial situation of EGHT, and that they materially relied on such representations to their detriment. To the extent that this cause of action and others allege a direct injury to the plaintiff school districts, they belong to the plaintiff school districts and not the estate...."

*Id.* at 1284–1285; *see also Chemtall, Inc. v. Citi–Chem, Inc.,* 992 F.Supp. 1390, 1405 (S.D.Ga.1998), citing *Educators Group,* 25 F.3d at 1284–1286 ("Where a creditor's complaint against a debtor's corporate principal alleges a direct injury to the plaintiff, such claim belongs solely to that plaintiff.... However, where the claims directly impact the debtor corporation ..., and only indirectly impact the plaintiff creditors, then the claims belong exclusively to the debtor (typically the trustee).").

contract with SPECO.[5] If, in fact, the Defendants made promises of non-interference to Riley, and broke those promises, the Court discerns no basis for SPECO to bring a suit for damages, based upon the Defendants' breach of this independent contract with Riley.[6]

■ Likewise, Riley contends in his fraud and promissory estoppel claims (Counts IV and V) that the Defendants made certain representations *to him,* in order to induce him to accept employment with SPECO, and to continue in that employment relationship with SPECO. According to Riley, those representations included promises that the Defendants would not interfere with his job performance as Chief Operating Officer. Riley also alleges: (1) that the Defendants knew their representations were false when they made them; (2) that he reasonably relied upon the representations; and (3) that the Defendants intended for him to so rely. (*Id.* at ¶¶ 28, 29, 32). These allegations support causes of action by Riley for fraudulent misrepresentation and promissory estoppel. The Court cannot envision SPECO recovering against the Defendants, based upon misrepresentations that they made directly to Riley.

■ Finally, the Court finds unpersuasive the Defendants' argument that Riley's intentional interference with contractual relations claim (Count III) actually belongs to SPECO. Like Riley's other claims, this claim stems from the Defendants' alleged interference with his job performance as Chief Operating Officer of SPECO. Specifically, Riley alleges that the "Defendants intentionally procured and caused a breach of [his SPECO Employment Agreement] through their domination of SPECO and their interference with Plaintiff's rights and responsibilities thereunder." (Doc. # 14 at ¶ 24).

Under Ohio law, these allegations conceivably could support a claim by Riley, and not SPECO, for tortious interference with contractual relations.[7] In *Fred Siegel Co., L.P.A. v. Arter & Hadden,* 85 Ohio St.3d 171, 707 N.E.2d 853, 858 (1999), the Ohio Supreme Court described the tort in the following terms: "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." Therefore, it the Defendants somehow induced or caused SPECO (the third party) not to perform its employment contract with Riley, then the Defendants may be liable to Riley for their tortious interference. Under such circumstances, SPECO itself could not pursue a tortious interference claim against the Defendants. Rather, such a claim would belong to Riley, the party who was harmed by the Defendants' act of inducing SPECO not to perform its contract with him. .

---

5. For example, in an April 1, 1996, Memorandum in Opposition to a prior Motion to Dismiss (Doc. 16), Riley asserted "that Defendants entered into a second agreement with Plaintiff in order to induce him to remain as President and Chief Operating Officer of SPECO. This second, verbal agreement, which also addressed the issue of the cessation of Defendants' interference and obstruction, is also set forth in the First Amended Complaint." (*Id.* at 4 n. 1).

6. In reaching this conclusion, the Court has not considered the merits, or viability, of Riley's breach of implied/oral contract claim. Rather, the Court merely finds that if the Defendants entered into a separate contractual agreement, directly with Riley, then SPECO could not pursue a claim against the Defendants, based upon their breach of the agreement.

7. Once again, the Court expresses no opinion regarding the merits of such a claim. For present purposes, the Court notes only that it can conceive of circumstances under which Riley could assert such a claim and SPECO could not. Therefore, under the Sixth Circuit's reasoning in *Van Dresser,* the intentional interference with contractual relations claim is not held by SPECO.

In opposition to the reasoning set forth above, the Defendants first argue that Riley's causes of action allege, and resulted in, clear and direct harm to SPECO. Therefore, they insist that his claims belong to SPECO's bankruptcy estate. In support of this argument, the Defendants cite a paragraph from the "Factual Allegations" portion of Riley's first amended Complaint (Doc. # 14). In that paragraph, Riley sets forth various allegations concerning the Defendants' wrongful interference with his job performance as a SPECO executive. (*See* Doc. # 14 at ¶ 13). He then asserts:

> ... Defendants' actions in contravention of their representations and their agreement were detrimental to the financial well being of SPECO and its employees, resulting in an aggravation of SPECO's business situation and resulting in the filing of bankruptcy by SPECO. Defendants' actions have greatly burdened the financial condition of SPECO and have been harmful to the employees of SPECO, as well as their families and the surrounding community.

(*Id.*).

In light of the foregoing allegations, the Defendants reason: "It is thus clear that the heart of Plaintiff's claims [is] based on injuries to SPECO and as such they are claims which rightfully belong to the estate of SPECO." (Doc. # 52 at 4). The Court finds this argument unpersuasive. Al-

though Riley alleges that the Defendants' misrepresentations *to him* resulted in some harm to SPECO, the causes of action arising therefrom belong solely to Riley. As noted above, SPECO could not have maintained causes of action against the Defendants, based upon false representations that they allegedly made directly to Riley. Thus, the harm inflicted upon Riley is direct, not derivative of harm to SPECO.[8]

In opposition to this conclusion, the Defendants also allege that SPECO suffered direct harm, as a result of their tortious activity, because Riley resigned from SPECO, thereby depriving that company of his services. The Court finds this argument equally unpersuasive. Assuming that Riley was a valuable employee, his departure may well have inflicted harm upon SPECO. Nevertheless, such harm to SPECO was itself derivative of the direct injury suffered by Riley as a result of the Defendants' misrepresentations to him.[9] SPECO could not have pursued breach of implied/oral contract, fraud, tortious interference, or promissory estoppel claims against the Defendants merely on the basis that it was deprived of Riley's services, as a result of the Defendants' tortious conduct. To the contrary, the harm flowing to SPECO was secondary to the direct harm suffered by Riley.

The Defendants next suggest that Counts II through V of Riley's first

---

**8.** *Cf. Educators Group*, 25 F.3d at 1285 ("We do agree, however, with the plaintiff school districts' contention that some of the causes of action allege a direct injury to themselves, which is not derivative of any harm to the debtor. For example, the plaintiff school districts allege in paragraph XI of the complaint that the defendants intentionally misrepresented *to them* the financial situation of EGHT, and that they materially relied on such representations to their detriment. To the extent that this cause of action and others allege a direct injury to the plaintiff school districts, they belong to the plaintiff school districts and not the estate.").

**9.** Indeed, if one of the Defendants had negligently struck Riley with a car as he crossed

the street, rendering him permanently and totally disabled, that tortious conduct would have "harmed" SPECO, in the sense that the company may have lost the services of a talented executive. Nevertheless, the Court harbors no doubt that any legal claims arising from such an accident would belong to Riley, not SPECO. In the present case, of course, Riley does not allege injury stemming from a car accident. Rather, he alleges injury stemming from willful misrepresentations that the Defendants made to him personally, and from the Defendants' breach of an oral contract that they entered into with him personally. The right to compensation for such misconduct belongs to Riley, given that he alone could pursue the causes of action set forth in his first amended Complaint.

amended Complaint are fatally defective, because they incorporate by reference an allegation contained in Count I. In particular, the Defendants note that Count I of Riley's Complaint alleges a breach of his written employment contract with SPECO. Given that SPECO has undergone Chapter 11 bankruptcy, and is not a party to this litigation, Riley asserts an "alter ego" theory in Count I, in order to "pierce the corporate veil" and to hold the Defendants liable. (*See* Doc. # 14 at ¶ 18). Counts II through V of Riley's first amended Complaint incorporate, by reference "as if set forth fully herein," all preceding paragraphs, including the "alter ego" paragraph in Count I. Recognizing that fact, the Defendants contend that each Count in Riley's Complaint is an "alter ego" claim. The Defendants then cite case law for the proposition that "alter ego" claims belong to SPECO's bankruptcy estate, and therefore, cannot be asserted by Riley. (Doc. # 44 at 12).

In response, Riley contends that he only intended to assert an "alter ego" claim in Count I of his Complaint. He insists that his other causes of action "are not based in any manner upon the actions of, or any injury to, SPECO." (Doc. # 48 at 1 n. 1). To the contrary, Riley asserts that "the remaining causes [of action] are based entirely and exclusively upon the actions of the Defendants and upon the injuries that such actions caused Plaintiff." (*Id.*).

Upon review, the Court declines to construe the first amended Complaint strictly against Riley, and to dismiss this action on the basis of possibly inartful pleading. Although Riley engaged in the common practice of utilizing incorporation by reference, he insists that he did not intend to state exclusively "alter ego" claims. After reviewing Counts II through V of Riley's first amended Complaint, the Court notes that nothing alleged therein (other than each Count's incorporation by reference of the "alter ego" paragraph of Count I) demonstrates that Riley did, in fact, intend to assert exclusively alter ego claims against the Defendants. Absent any clear evidence to the contrary, the Court accepts

Riley's representation that Counts II through V were not intended to be based upon "alter ego" liability.

■ In a final argument, the Defendants contend that Riley previously negotiated a settlement with SPECO, resolving all of the claims that are set forth in his amended Complaint. This argument implicates an agreement that Riley negotiated during the course of SPECO's bankruptcy proceedings. The agreement resolved the adversary proceeding between SPECO and Riley. As part of that agreement, Riley agreed to release all claims against SPECO, and to release the Defendants from "any and all claims derivative through Debtor [SPECO]." (Doc. # 44 at Exh. C).

Relying upon their prior argument that Riley's claims actually are held by SPECO, and that he is asserting such claims only derivatively, the Defendants contend that the adversary proceeding settlement precludes Riley from pursuing the causes of action set forth in his amended Complaint. The Court finds this argument unpersuasive. In its analysis, *supra*, the Court determined that Riley's claims for breach of implied/oral contract, intentional interference with contract, fraud, and promissory estoppel are not held by SPECO and do not allege injury that is derivative of any injury suffered by SPECO. Rather, Riley's claims are based upon his assertion: (1) that the Defendants directly entered into a separate implied/oral contract *with him;* (2) that the Defendants made fraudulent misrepresentations *to him,* in order to induce him to enter into the oral/implied contract; (3) that he reasonably relied upon certain promises that the Defendants made *to him,* and that they should have expected him to so rely; and (4) that the Defendants intentionally interfered with *his* contractual relations, by apparently inducing SPECO not to perform under its contract with him. These claims allege a direct, not derivative, injury to Riley and, as set forth, *supra,* he alone possesses the ability to pursue these claims, which can-

not be considered "derivative" of SPECO's separate and distinct claims against the Defendants, or Riley's separate and distinct claims against SPECO. With the exception of the first count in Riley's amended Complaint, which he now acknowledges is "derivative" and has chosen not to pursue, the other counts simply do not allege derivative liability.

In addition, the adversary proceeding agreement, upon which the Defendants rely, contains a paragraph *expressly excluding* the present litigation from its reach. That agreement contains a paragraph, stating:

> In addition to the release provided hereunder, Debtor [SPECO] and Riley for the benefit of the defendants in Case No. C–3–96–18 (the "Defendants"), pending in the United States District Court for the Southern District of Ohio, Western Division, *further agree that this settlement agreement,* the order approving such agreement or any separate order allowing the claim or approving distribution, *shall not in any way be construed to have any res judicata or collateral estoppel effect on claims which Riley may have against the Defendants* or claims that the Defendants may have against Riley in the Federal District Court proceedings. . . .

(Doc. # 44 at Exh. C, ¶ 3) (Emphasis added). The foregoing language lends additional support to the Court's conclusion that Riley's settlement agreement does not preclude the present litigation.

In short, given that Counts II through V of Riley's amended Complaint are held by him, not SPECO, and that his settlement agreement with SPECO does not cover the present litigation, the Court hereby overrules the Defendants' Motion to Enforce Settlement Agreements and to Dismiss Action with Prejudice (Doc. # 44), insofar as it is directed toward those counts. The Defendants' Motion is sustained, however, insofar as it relates to the breach of express contract claim in Count I of Riley's amended Complaint (Doc. # 14). Riley has conceded that Count I is a "derivative

claim" and, therefore, that it cannot be maintained against the Defendants. (*See* Doc. # 48 at 1 n. 1).

## II. *Plaintiff's Motion for Leave to File Second Amended Complaint (Doc. # 47)*

Having resolved the Defendants' Motion to Enforce Settlement Agreements and to Dismiss Action with Prejudice (Doc. # 44), the Court turns now to Riley's Motion for Leave to File a Second Amended Complaint (Doc. # 47). In his Motion, Riley seeks leave to delete his abandoned breach of express contract claim (Count I), to delete his claims against Defendants Jacques Bouhelier and Eric Bachelet, and to "clarify" that his other causes of action are not "derivative" in nature.

In response, the Defendants urge the Court to deny Riley's Motion for Leave to Amend for four reasons. *First,* they contend that Riley has exhibited bad faith by attempting to "recast his entire legal theory" in order to avoid the dismissal of his claims. *Second,* they assert that he has "repeatedly" failed to cure deficiencies in his complaint by amendments. *Third,* they argue that permitting Riley to amend his Complaint would be futile. *Fourth,* they contend that Riley's proposed amendment would violate the doctrine of "mend the hold."

█ Upon review, the Court finds the Defendants' arguments in opposition to Riley's proposed amendments unpersuasive. With respect to the Defendants' first argument, the Court cannot agree that the proposed second amended Complaint constitutes a wholesale revision of Riley's legal theories. The existing first amended Complaint and the proposed second amended Complaint contain three significant differences: (1) Riley's proposed Complaint omits his breach of express contract claim, which was based on an "alter ego" theory; (2) the proposed Complaint omits Jacques Bouhelier and Eric Bachelet as Defendants; and (3) the proposed Complaint alleges that the terms of Riley's

implied/oral contract included his receipt of a $200,000 a year salary from SNECMA and SNECMA, Inc., payable for a minimum of eighteen months, unless he was terminated for good cause.

The Court finds no possible inference of bad faith arising from the first two proposed amendments, and the Defendants advance no such argument. Rather, the Defendants focus on Riley's allegations about the existence of an oral contract directly with SNECMA and SNECMA, Inc. According to the Defendants, the proposed second amended Complaint "alleges for the first time the existence and breach of a new verbal employment contract directly between himself and Defendants, rather than [his] suing on claims for injuries caused by Defendants' alleged conduct and misrepresentations resulting in an alleged breach of the written agreement between the Plaintiff and SPECO, the subject of his first two complaints." (Doc. # 51 at 3).

The Court finds the Defendants' argument unpersuasive. Contrary to their assertions, Riley's existing first amended Complaint alleges that the Defendants made certain "representations, inducements, and agreements," which gave rise to an oral or implied contract. (Doc. # 14 at ¶¶ 21–22). The Complaint also describes the nature of those "representations, inducements, and agreements." Specifically, Riley's first amended Complaint alleges that he threatened to resign from his position with SPECO, after tiring of the Defendants' repeated interference with his job performance. (*Id.* at ¶ 14). As a result of his complaints:

> Defendants, as part of their continual representations to Plaintiff, induced Plaintiff to remain employed. Defendants offered a verbal agreement to Plaintiff in order to induce him to remain employed and not to exercise the termination provisions of the Employment Agreement. Plaintiff accepted this agreement and, in consideration thereof, remained in his position. Pursuant to this agreement, Defendants would terminate and cease all interference with Plaintiff's rights and duties as President and Chief Operating Officer of SPECO. Further, Defendants would permit Plaintiff to perform without interference and obstruction. Moreover, Plaintiff was to be made the President, Chief Executive Officer and Chairman of the Board of Directors of SPECO. Further, as Chairman of the Board of Directors, Plaintiff would report only to the executive management level of SNECMA. Defendants failed to comply with their representations and agreement because, among other things, Defendants' interference and obstruction with Plaintiff's rights and obligations increased immediately following this agreement.

(First Amended Complaint, Doc. # 14 at ¶ 14).

Notably, Riley alleged in April, *1996*, before the Court-imposed bankruptcy stay, that his oral/implied contractual agreement with the Defendants was separate and distinct from his employment agreement with SPECO. (*See* Doc. # 16, Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss under Rule 12(b)(6) at 4 n. 1 ("Further, since the filing of the original Complaint, it is clear that the Defendants entered into a second agreement with Plaintiff in order to induce him to remain as President and Chief Operating Officer of SPECO. This second, verbal agreement, which also addressed the issue of the cessation of Defendants' interference and obstruction, is also set forth in the First Amended Complaint.")).

Admittedly, Riley's second amended Complaint further clarifies that his purported oral/implied contract is separate and distinct from his employment agreement with SPECO. In relevant part, the proposed second amended Complaint alleges:

> 8.... In the Spring and Summer of 1995, Plaintiff and Defendants determined that the resolution to the [interference] problem was to change the nature of the relationship between the

parties. Separate and apart from the written employment contract with SPECO, Defendants and Plaintiff agreed, as of October 1, 1995, to a contract whereby Plaintiff would be employed directly by Defendant SNECMA, Inc. and by Defendant SNECMA. Defendants offered this agreement to Plaintiff in order to induce him to forego other employment opportunities. Plaintiff accepted this agreement and, in consideration thereof, did not pursue other employment opportunities.

9. Pursuant to this agreement between Plaintiff and Defendants, Defendants would cease all interference with Plaintiff's rights and duties under both Plaintiff's agreement with SPECO and Plaintiff's new agreement with Defendants. Further, Defendants would permit Plaintiff to perform without interference and obstruction. Plaintiff and Defendant also agreed that Plaintiff would report to the senior executive management level of SNECMA, while also serving as President, Chief Executive Officer and Chairman of the Board of Directors of Defendants' other subsidiary/affiliated company, SPECO. This agreement between Plaintiff and Defendants is separate and distinct from the original agreement between Plaintiff and SPECO.

10. Pursuant to the agreement with Defendants and to the other representations and promises made by Defendants, Plaintiff did not terminate his relationship with SPECO and failed to pursue other employment opportunities. Further, pursuant to this agreement, Plaintiff was to be paid a salary of $200,000 by Defendants during his first year of employment with Defendant SNECMA and SNECMA, Inc., as well as an incentive bonus and other fringe benefits. Additionally, the agreement between Plaintiff and Defendants provided that Plaintiff would receive a minimum of 18 months['] salary and other compensation, unless Plaintiff's employment with Defendants SNECMA and SNECMA, Inc. was terminated for cause.

(Doc. # 47, Second Amended Complaint, at ¶¶ 8–10).

Without question, the foregoing allegations provide significantly greater detail regarding the specifics of Riley's purported oral/implied contract with the Defendants. The Court also understands the Defendants' surprise at Riley's new allegation concerning the terms of the oral/implied contract (i.e., $200,000 per year, with eighteen months of pay guaranteed). Nevertheless, the Court cannot agree that Riley's allegations about the *existence* of an oral/implied agreement constitute an attempt to interject an entirely new legal theory into this litigation. To the contrary, Riley has long alleged the existence of an oral or implied contractual agreement. His second amended Complaint merely fleshes out the terms of the agreement. In any event, the Court finds unpersuasive the Defendants' argument that Riley's second amended Complaint demonstrates the exercise of bad faith on his part.

The Court also finds unpersuasive the Defendants' contention that Riley has repeatedly failed to cure substantive deficiencies in his Complaint. In response to Riley's initial Complaint, the Defendants filed Motions to Dismiss, pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6). (Doc. # # 8–9). In response, Riley filed his first amended Complaint, in an effort to cure what he perceived as technical pleading deficiencies. The Defendants then filed their present Motion to Enforce Settlement Agreements and to Dismiss Action with Prejudice (Doc. # 44), arguing that Riley's claims belong to SPECO and have been settled by that entity. In response to that Motion, which the Court has largely rejected, Riley has voluntarily withdrawn Count I of his first amended Complaint, and he now seeks to omit the two individual Defendants, and to clarify the nature of his oral/implied contract with the Defendants. Given that Riley successfully amended his Complaint on only *one* prior

occasion, the Court cannot agree that he has "repeatedly failed to cure deficiencies."

The Court also finds unpersuasive the Defendants' argument that Riley's proposed amendments would be futile and, therefore, that they should not be permitted. In their Memorandum, the Defendants first allege that Counts II through V of the proposed second amended Complaint "are mere recitations" of the claims set forth in the first amended Complaint. As a result, the Defendants argue that such claims are barred by the various bankruptcy settlement agreements. In its analysis, *supra,* however, the Court has concluded that Riley's claims are not barred by the settlement agreements.

 In a second "futility" argument, the Defendants allege that Riley's purported oral employment agreement violates the statute of frauds, because it cannot be performed within one year. After reviewing the proposed second amended Complaint, the Court cannot agree that the statute of frauds necessarily bars the oral contract claim. The relevant portion of the proposed Complaint alleges that Riley was to be paid a salary of $200,000 "during his first year." Contrary to the Defendants' assertions, however, this language does not unambiguously establish that the oral agreement necessarily extended *beyond* one year. Indeed, it only establishes a rate of pay, and not a definite duration of the employment relationship. The Defendants also stress, however, that the purported oral contract "provided that Plaintiff would receive a minimum of eighteen months' salary and other compensation, unless Plaintiff's employment with Defendants SNECMA and SNECMA, Inc. was terminated for cause." Once again, this provision does not necessarily establish a minimum term of employment. Rather, it could be construed as guaranteeing Riley a minimum severance package of eighteen months' pay, in the event that the Defendants terminated his employment through no fault of his own. Such an interpretation would place the alleged oral contract outside the scope of the statute of frauds.

*See Henkel v. Educational Research Council,* 45 Ohio St.2d 249, 344 N.E.2d 118 (1976), at syllabus ("In the absence of facts and circumstances which indicate that the agreement is for a specific term, an employment contract which provides for an annual rate of compensation, but makes no provision as to the duration of employment, is not a contract for one year, but is terminable at will by either party."); *Stout v. M. Aron Corp.,* 1993 WL 169102, Franklin App. No. 92AP–1179 (10th Dist. May 13, 1993) ("An oral employment contract which is for an indefinite period of time or is from year-to-year is outside of the statute of frauds since it could be completed within one year because the employee could be terminated for any reason or voluntarily discontinue working or, if year-to-year, the contract could be terminated by either party at the end of any year.").

 The Defendants also allege that Riley's proposed amendments concerning his oral contract are futile, because the alleged agreement lacks consideration. Specifically, the Defendants argue that the oral contract purports to require Plaintiff to perform tasks which he already was legally obligated to perform under the written employment agreement between Plaintiff and SPECO. However, the Court notes the existence of recent Ohio case law which contradicts the Defendants' argument. *See, e.g., Canter v. Tucker,* 110 Ohio App.3d 421, 674 N.E.2d 727, 729–730 (10th Dist.1996) (citing several cases "wherein courts held that, in the case of an at-will employee, continued employment alone was valid consideration …"). Although Ohio's courts are split on the issue, the prevailing view appears to be that continued employment alone constitutes adequate consideration. In any event, Riley's oral contract argument is certainly colorable enough to avoid the denial of leave to amend on the basis of futility.

 Finally, the Defendants allege that Riley's attempt to "completely rewrite his theory of the case" violates the "mend the hold" doctrine, which was articulated

by the Sixth Circuit in *Spitzer v. Board of Trustees for Regina Public School District No. 4 of Saskatchewan,* 267 F. 121 (6th Cir.1920). The doctrine provides that:

> [w]here a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principal of law.

*Id.* at 128.

■ Contrary to the Defendants' assertions, it does not appear to the Court that Riley has attempted to re-write his theory of the case or otherwise to "mend his hold." In their Memorandum, the Defendants themselves recognize that all but one of the Counts in Riley's proposed second amended Complaint merely repeat his prior allegations. Furthermore, the Court cannot agree that the one Count to which they object (the oral contract count) raises a "completely new allegation." To the contrary, Riley's first amended Complaint alleges the existence of an oral contract. His proposed second amended Complaint fleshes out the terms of that agreement. Accordingly, the Court finds the "mend the hold" doctrine inapplicable under the present circumstances.

■ The Court also notes that the Defendants have not alleged that they will suffer prejudice if Riley is granted leave to file his second amended Complaint. The existence of prejudice, or lack thereof, is a primary consideration when a District Court considers a request for leave to amend a pleading. *Head v. Jellico Housing Authority,* 870 F.2d 1117, 1123 (6th Cir.1989). Finally, the Court finds that granting Riley leave to amend his Complaint will not result in any excessive delay. The present litigation has been stayed for most of its life on the Court's docket. Not until July 26, 1999, did the Court lift a bankruptcy stay that it had imposed on August 6, 1996. Consequently, little discovery or other pretrial activity has occurred.

In light of the considerations set forth above, and in the exercise of its discretion, the Court hereby sustains the Plaintiff's Motion for Leave to File a Second Amended Complaint (Doc. # 47). The Plaintiff is granted fourteen (14) days from the date of this Decision and Entry to file said Complaint.

Counsel of record will take note that a telephone conference call has been set for Friday, October 1, 1999, at 8:40 a.m., to establish a trial date and other dates leading to the resolution of this litigation.